William S. Grimaldi and Elizabeth S. Grimaldi v. Commissioner.
Grimaldi v. Commissioner
Docket No. 91016.
United States Tax Court
T.C. Memo 1963-156; 1963 Tax Ct. Memo LEXIS 188; 22 T.C.M. (CCH) 739; T.C.M. (RIA) 63156; June 6, 1963
Harold Kamens, 10 Commerce Court, Newark, N.J., for the petitioners. Gerald N. Daffner, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1954, 1955, and 1956 in the amounts of $4,603.04, $3,225.77, and $1,162.83, respectively. The issues to be decided are: (1) Whether vacant and improved property and interests in property sold by petitioners during the years in issue were at the time of sale held by petitioners primarily for sale to customers in the ordinary course of their trade or business. (2) Whether amounts received by William Grimaldi and deposited in a trust account are includable in petitioners' income in the year of receipt. (3) Whether petitioners are entitled to deduct entertainment and *189 medical expenses in amounts in excess of the amounts allowed by respondent. Findings of Fact Some of the facts have been stipulated and are found accordingly. William S. Grimaldi (hereinafter referred to as William) and Elizabeth S. Grimaldi (hereinafter referred to as Elizabeth) are husband and wife residing in Haworth, New Jersey. For the calendar years 1954, 1955, and 1956, they filed joint Federal income tax returns with the district director of internal revenue at Newark, New Jersey. At all times material herein, petitioners have used the cash receipts and disbursements method of accounting as the basis for reporting their income for Federal income tax purposes. In 1935, William was admitted to practice in the State of New Jersey as counsellor and attorney at law. At the present time he maintains an office in Hackensack, New Jersey. Since his admission to the bar, he has been actively engaged in the private practice of law. Prior to her marriage to William in 1946, Elizabeth worked for a stock brokerage firm. During the years here involved Elizabeth was a housewife. Petitioners had three young children during the years here involved. As an attorney William possesses *190 specialized knowledge and experience in the field of real estate and municipal law. In the latter category, he has had experience in zoning, planning, and magistrate's work. William is commonly known as and referred to as a real estate lawyer. During the years 1954, 1955 and 1956, approximately 80 to 90 percent of his earnings from practice of law resulted from services performed for clients in real estate transactions. Petitioners' income tax returns for the years 1952 to 1957 reflected income from the following sources: Gross Receipts
Net Income
Gain from Sales
Income
from
from
of Interest
from
Year
Law Practice
Law Practice
in Real Estate
Rentals
1952
$13,687.85
$1,724.78
$ 4,722.52
$1,512.53
1953
17,237.29
2,650.60
14,958.65
640.68
1954
18,372.58
2,751.39
25,758.94
987.03
1955
29,868.46
9,162.67
* 16,089.22
887.64
1956
21,179.94
3,226.04
9,512.29
629.01
1957
24,283.32
6,151.02
6,882.49
3,448.22
William also received income during these years from the Borough *191 of Harvey Cedars, New Jersey as magistrate and the Borough of Barnegat Light, New Jersey for services performed as municipal attorney, as well as income during the years 1954 through 1957 from Bergen County Land Corp. (hereinafter referred to as Bergen County), a New Jersey corporation. Petitioners are 50 percent shareholders of Bergen County, the other 50 percent being owned by Adolph J. Supporta, a retired automobile dealer. The corporation buys and sells mortgages, buys, sells and manages its own properties, and buys and sells vacant property. Petitioners also own 33 1/33 percent of the stock of State Land Co., Inc., a New Jersey corporation, which buys and sells vacant land, 33 1/3 percent of the stock of South Jersey Investors Corp., a New Jersey corporation that buys and holds tax liens, and 50 percent of the stock of 1st Englewood Holding, Inc. and 18.8 percent of the stock of K-D, Inc., both of which are New Jersey corporations, each of which owns and operates an apartment house. William performs any legal work required by K-D, Inc., on a retainer basis, plus reasonable legal fees. Sales of vacant lots in which petitioners had an interest were made during the years 1952 *192 through 1957, as follows: Petitioners'
Date
Date
Number
Number
Interest
Location
Acquired
Sold
of Lots
of Sales
1952
33 1/3%
Harvey Cedars, N. J.
10/20/45
3/14/52
1
1
6/16/46
1/24/52
2
1
11/16/46
8/25/52
1
1
1/ 8/47
9/16/52
1 5
1 4
70%
Lodi, N. J.
4/ 3/51
6/22/52
5
1
100%
Hackensack, N. J.
10/18/45
7/ 1/52
2
1
100%
Lodi, N. J.
6/12/51
6/ 2/52
18
1
100%
Harvey Cedars, N. J.
2/27/51
3/14/52 *
1 21
1 3
Total
31
8
1953
50%
Hackensack, N. J.
8/14/50
7/ 6/53
4
1
100%
Wood-Ridge, N. J.
4/20/44
1/15/53
9 acres
1
Paramus, N. J.
6/30/48
3/16/53
2
1
Lodi, N. J.
11/19/52
9/29/53
2
1
Haworth, N. J.
2/17/53
2/20/53
2 6
1 4
Total
10 **
5
1954
50%
Hackensack, N. J.
1948
8/14/50
2/16/54
5
1
Little Ferry, N. J.
12/22/47
3/30/54
1
1
Hackensack, N. J.
1948
8/14/50
4/13/54
5
1
Hackensack, N. J.
1948
8/14/50
7/ 2/54
2
1
Hackensack, N. J.
1948
8/14/50
9/ 1/54
4
1
Hackensack, N. J.
8/14/50
8/ 2/54
8 25
1 6
100%
Harvey Cedars, N. J.
7/28/53
5/15/54
1
1
Hackensack, N. J.
5/25/54
7/29/54
2
1
Hackensack, N. J.
2/23/54
5/ 7/54
2 5
1 3
Total
30
9
1955
25%
Bergenfield, N. J.
4/27/55
11/18/55
11
1
50%
Hackensack, N. J.
1948
8/14/50
6/ 9/55
4
1
100%
Hackensack, N. J.
Contract
right
Acquired
9/26/53
3/18/55
1
Haworth, N. J.
7/14/53
5/11/55
2
1
Ramsey, N. J.
10/14/52
5/ 6/55
2
1
Harvey Cedars, N. J.
1947
5/21/51
7/15/55
1
1
Paramus, N. J.
8/25/54
7/ 5/55
2
1
Harvey Cedars, N. J.
6/27/55
8/30/55
1 8
1 5
Total
23
8
1956
50%
Hackensack, N. J.
5/27/55
1/ 4/56
2
1
Atlantic Highlands,
1936
8/ 7/53
3/27/56
1 3
N. J.
1 2
100%
Paramus, N. J.
1949
10/26/54
12/26/56
2
1
1949
8/26/54
1/13/56
2 4
1 2
Total
7
4
1957
25%
Paramus, N. J.
1/21/56
9/13/57
2
1
50%
Hackensack, N. J.
5/27/55
1/31/57
2 1
Carlstadt, N. J.
3/ 1/55
9/ 3/57
1 1
Hackensack, N. J.
3/ 1/56
1/15/57
2 5 1
3
100%
Waldwick, N. J.
7/15/55
9/ 6/57
2
1
Total
9
5
*193 Sales of improved property in which petitioners had an interest were made during the years 1954 through 1956, as follows: Petitioners'
Date
Date
Interest
Description
Location
Acquired
Sold
1954
50%
Auto Service
Ship Bottom, N.
12/10/53
8/ 2/54
Station
J.
Masonry Frame
Bogota, N. J.
1952
6/30/54
Building
100%
Brick Building
Bogota, N. J.
7/29/53
6/30/54
1955
50%
Frame Building
Ridgefield Park,
2/ 1/53
11/ 1/55
N. J.
100%
Brick Building
Bogota, N. J.
7/27/54
7/ 1/55
100%
One-Family
Teaneck, N. J.
3/ 3/55
11/ 3/55
Dwelling
100%
65 DeWitt Place
Hackensack, N. J.
2/52
1/ 3/55
1956
50%
Frame Building
Hackensack, N. J.
9/ 1/53
5/ 1/56
100%
Frame Building
Hackensack, N. J.
3/ 1/56
3/29/56
There were 30 [1] transactions involving the sale of real estate or interests in real estate reported by petitioners on their income tax returns for the years in issue. Seven of the transactions involved joint purchases of property by Elizabeth with Angie Dell, a licensed real estate broker. In these joint *194 purchases, Dell put up the purchase price and agreed to pay the real estate taxes, with Elizabeth, the co-owner, obligated to pay Dell interest on one-half the amount he advanced when the property was sold, Dell to be reimbursed for his costs and expenses and to receive this interest from the first proceeds from any sale of any part of the property. Dell tired of paying the taxes on these properties and these properties were sold by Dell so that he could be reimbursed out of the sale proceeds. Dell handled the arrangements respecting the sale and charged Elizabeth a sales commission. Two other transactions involved the sale of properties owned jointly by Elizabeth, one with Frank Altomare, the other with Milton Wollman and his wife. Wollman was a real estate dealer. The sale of the property Elizabeth owned with Altomare was made because the real estate taxes on the property were unexpectedly high and the property Elizabeth owned with Wollman was sold in order to raise funds to meet real estate tax obligations on the property sold and on other property owned jointly by Elizabeth and Wollman. *195 Three transactions involved oceanside properties which petitioners planned alternatively as a location for a summerhouse. William had drawn up rough architectural sketches for a house on one of these properties. The property was sold when Elizabeth decided to have a summerplace in the mountains instead. The other two properties were each undersized lots separated by a middle lot and were sold when petitioners were unable to purchase the middle lot to complete an adequate building lot. The gains on these three transactions were $2,326.22, $45.95, and $545.85. Two transactions involved sales of properties which had been purchased jointly by petitioners and third parties where differences arose between the co-owners. Petitioners sold their interest to the co-owner to avoid litigation. Four transactions involved sales to Bergen County. Three of these transactions covered apartment properties which petitioners had held for no more than 2 1/2 years. The other sale involved vacant land which petitioners had held for less than a year and which they had purchased with the understanding that Bergen County would buy it from them. Three transactions involved the sale of rental properties *196 which had fallen into poor repair and were being vandalized. Petitioners had held these properties less than 3 years. Two transactions involved the quick turnover of properties which William had bought because he had in mind a prospect to whom they might be sold. William performed legal services in clearing the title on these properties before he sold them. One other transaction involved the purchase by William of property which had a defective title. William had previously certified the title for a client and felt morally obligated to take the property off his client's hands. William was able to clear the title and sell the property for a gain within the month. One transaction involved an arrangement between William and Hudson Trading Corporation whereby William reimbursed Hudson to the extent of 25 percent of its cost and expenses with respect to certain property held by Hudson in return for 25 percent of the proceeds on the eventual sale of the property by Hudson. Three transactions involved the purchase of property or interests in property at public auction. With respect to two of the properties the interest initially acquired was tax certificates. William brought legal actions *197 foreclosing on the certificates and on foreclosure petitioners purchased the property. The properties were undersized and were of value only to the adjoining owners to whom they were sold. One transaction involved the sale of property William had purchaser from a relative of Elizabeth. William had agreed to sell the property for the relative and when a sale to a third party fell through William felt obligated to buy the property himself. Another transaction involved a one-half interest in a contract to purchase property. William held the contract interest a little over 2 years. During the years 1953 through 1957 petitioners purchased a total of 63 lots and 5 pieces of acreage for which real estate taxes were deducted on their Federal income tax returns. William performed most of the legal work required in connection with the sale and acquisition of the lots and improved property, which included the perfecting of title, sometimes through foreclosure, and the preparation of deeds transferring the property. The secretaries employed by petitioner in his law office did the necessary paper work. On one or two occasions, petitioners subdivided properties. This would occur when under *198 the exigencies of the circumstances, subdivision was deemed prudent. William performed the legal work required in this connection. Petitioners, themselves, never advertised their properties for sale, never solicited individuals to purchase any of them, and were not listed or known as real estate brokers. A substantial portion of the properties conveyed by petitioners during the years 1952 through 1957 were located in Bergen County, New Jersey, which is the second largest county in New Jersey in terms of population. During this period the population of Bergen County, New Jersey, was increasing and there was a continuing demand for vacant properties in Bergen County. Respondent increased petitioners' income for the taxable years 1954, 1955, and 1956, in the amounts of $12,469.98, $7,246.69, and $4,775.68, respectively, with the explanation that these amounts represent the proceeds from the sale of real estate deemed to have been made in the ordinary course of petitioners' business. Respondent also increased petitioners' income for 1955 by $1,050, representing the profit on the sale of real estate which had been omitted from the 1955 return. Respondent increased petitioners' income *199 for years 1955 and 1956 in the respective amounts of $400 and $125 with the explanation in each year that the amount was to adjust for legal fee claimed as an expense of sale in connection with the sale of property which amount could not be reconciled with business receipts of William S. Grimaldi. Respondent disallowed the amount of $525 of the deduction claimed by petitioners as entertainment expense for the year 1954 with the explanation that the disallowed portion "was not established to be an ordinary and necessary business expense." Respondent disallowed the amounts of $302.79, $411.51 and $678.75 claimed by petitioners as a deduction for medical expenses for the years 1954, 1955 and 1956, respectively. The 1954 disallowance resulted from the increase in petitioners' adjusted gross income for that year as determined by respondent. The disallowances for 1955 and 1956 resulted in part from the increases in petitioners' adjusted gross income determined by respondent and in part from the disallowance of medicinal and drug expenses of $165 and $315, respectively, and other medical expenses of $297.01 and $178.31, respectively. Ultimate Facts With the exception of the three *200 parcels of property purchased for use as a location for a summer residence, petitioners at the time of sale of each parcel of real estate and each contract interest in real estate sold by them during the taxable years here involved held such property primarily for sale to customers in the ordinary course of their trade or business. Petitioners had income from legal fees for the years 1955 and 1956 in the amounts of $400 and $125, respectively, in addition to the amounts reported by them on their income tax returns. Petitioners are not entitled to entertainment or medical expense deductions in excess of the amounts allowed by respondent except to the extent that any reduction in their adjusted gross income below that determined by respondent results from our opinion herein causing an increase in the deductible percentage of medical expenses. Opinion The principal issue in this case is whether the gain realized by petitioners from the sale of real estate during the taxable years here involved was capital gain or ordinary income. Section 1221 of the Internal Revenue Code of 1954 defines capital assets to include all property held by a taxpayer with the *201 exceptions therein set forth among which is property held by a taxpayer primarily for sale to customers in the ordinary course of his trade or business. The question here is whether the real property or interest therein sold by petitioners in 1954, 1955, and 1956 was held by petitioners primarily for sale to customers in the ordinary course of their trade or business. Petitioners take the position that most of the properties sold by them in the years here in issue were purchased for investment but were sold when subsequent to the purchases unforeseen circumstances developed making their sale advisable. Petitioners state that the few properties which were purchased by them for resale were not held for sale to customers in the ordinary course of their trade or business since they were not in the trade or business of selling real estate. Whether a taxpayer's activities in buying and selling real property constitute a trade or business is essentially a question of fact. D. L. Phillips, 24 T.C. 435 (1955). Various criteria have been used in resolving this factual issue. Among these criteria are the nature of the acquisition of property, the frequency and continuity of *202 transactions, substantiality of transactions, the activity of the seller or those acting on his behalf with respect to the property, and any other fact which tends to indicate whether the transaction is in furtherance of an occupation of the taxpayer. Friend v. Commissioner, 198 F. 2d 285 (C.A. 10, 1952), affirming a Memorandum Opinion of this Court. William is a real estate lawyer. Eighty to ninety percent of his legal fees during the years in issue came from handling real estate transactions for his clients. During the years 1952 to 1957, inclusive, petitioners sold 110 vacant real estate lots in 39 separate transactions. During the 3 taxable years 1954, 1955, and 1956, petitioners sold 9 pieces of improved rental property. Also during the 6-year period from 1952 to 1957, petitioners purchased 63 lots plus 5 parcels of acreage. William handled the legal work with respect to most, if not all, these real estate transactions. In some instances William performed legal services in clearing up defects in the title to the properties. In at least one case a lot was subdivided or a part of the lot was split off in order to facilitate a sale. Some of the real estate transactions *203 were made in conjunction with a licensed realtor, Dell, who apparently sold the property through his sales channels, and Dell charged petitioners a brokerage commission. Petitioners were also substantial shareholders in three corporations which were in the business of buying and selling real estate. William at the trial conceded that two of the transactions involved quick resales where the property was purchased with a specific customer in mind to whom to resell. William also listed seven other transactions as being of the type that real estate dealers would enter into. In many of the transactions petitioners invested none of their own funds but merely agreed to have a percentage of the purchase price plus interest thereon paid to Dell together with reimbursement for his expenses of carrying the property from the first proceeds of any sale of any part of the property. The record is silent as to the advantages to Dell from this arrangement. Such an arrangement does not indicate an investment motive on the part of petitioners but indicates that petitioners must have had some special talent in locating desirable properties to purchase for resale at a profit. Petitioners assign as their *204 reason for selling some of the properties the high New Jersey real estate taxes. William must have known of the high tax rate when he purchased the properties and intended to sell them before the taxes paid absorbed all of his expected profits. The number and continuity of the sales that petitioners have made, the purchases made by petitioners during the period of their sales, the relatively short holding period for the property sold, and the high percentage of William's income which was received from the sale of properties as compared to that from his practice of law, all indicate that petitioners were in the trade or business of selling real estate. William testified that his plan was to buy real estate and, when the property reached what he felt was a maximum value, to sell. However, one who is willing to sell "when the price was right" is holding the property primarily for sale and such a holding takes the property out of the definition of capital asset when such a person is in the trade or business of selling real estate to customers. Estate of Eugene Merrick Webb, 30 T.C. 1202 (1958). See also Real Estate Corporation, 35 T.C. 610 (1961), affd. *205 301 F. 2d 423 (C.A. 10, 1962), certiorari denied 371 U.S. 822, rehearing denied 371 U.S. 917. Petitioners contend that property owned jointly with Dell was sold in order to pay real estate taxes on that and other property that they owned together. The property sold was acquired and sold in accordance with an arrangement whereby Elizabeth and Dell jointly purchased real estate for which Dell supplied the initial purchase price and agreed to pay the real estate taxes and other expenses. Elizabeth agreed to pay Dell interest on one-half the amount he advanced. The two were joint venturers and because Dell had put up all the consideration he could control the decisions as to when and for what purpose the property should be sold. Petitioners contend that they urged Dell not to sell but there is no showing that petitioners tried to change their operating arrangement with Dell and assume, even in part, the financial burden of holding the property. Dell was a licensed real estate broker and was not shown to be a real estate investor also. In view of the fact that Dell put up the entire purchase price and obligated himself to pay all the expenses, petitioners' *206 investment in the joint venture was minimal. The transaction, from petitioners' point of view, can hardly be called an investment. Petitioners argue that rental property sold during the taxable years was investment property. However, petitioners have not shown that they treated the rental property any differently from their other holdings. Rental property which is held either for rent or sale, whichever is more advantageous, is being held primarily for sale. Rollingwood Corp. v. Commissioner, 190 F. 2d 263 (C.A. 9, 1951), affirming a Memorandum Opinion of this Court. As far as the record shows the rental properties were being held for advantageous resale the same as petitioners' other properties. The record shows no separate accounts kept with respect to the rental properties. See Walter R. Crabtree, 20 T.C. 841 (1953). The holding periods for the rental properties ranged from 6 months to 3 years and were comparable to the holding periods for the other properties petitioners purchased and sold. The amount of rental income was low as compared to gains on the sales. Petitioners contend that two transactions involved undersized plots which would be of value *207 only to the adjoining land owners. Even though the prospective purchasers for a piece of property are limited, they are nonetheless customers. Cf. Paul K. Ashby, 37 T.C. 92 (1961), and Pennroad Corp. v. Commissioner, 261 F. 2d 325 (C.A. 3, 1958), affirming 29 T.C. 914 (1958). Petitioners contend that the transfers of property to Bergen County, a corporation in which they had a 50 percent shareholder interest, were not sales but rather contributions to capital. The parties had stipulated that these transfers constituted sales, petitioners treated the transactions as sales and reported the gains therefrom on their income tax returns as gains from sales. In at least one instance petitioners received a note previously executed by them in payment for the property upon transfer to the corporation. Petitioners point to the facts that some of the sales were forced upon them by coowners who threatened to partition the property, that William was practicing law during the years in issue and spent only minimal time handling real estate dealings, that Elizabeth had little time to spend in connection with the real estate transactions because of her time *208 being occupied as a housewife and mother of three small children, and that they never advertised or solicited customers for their properties as indicating that they were not in the trade or business of selling real estate. These points are not substantial in view of the other facts here present. If property is held for sale to customers, it does not change the nature of such holding if the actual sale is forced by condemnation or a threatened partition action. The record adequately supports the finding that the properties were held for sale to customers at the time they were sold to the coowners. The record shows that William and the employees of his law office expended the necessary time and effort to make the sales and purchases. The lack of sales activities can be ascribed to the fact that there was an increasing demand for real estate in New Jersey at the time. The sales to Bergen County, a controlled corporation, required no selling activity. Some of the properties were sold by Dell, a licensed realtor, who insofar as the records show, did advertise. Three transactions in issue involved the sale of properties purchased by petitioners as possible locations for a summerhouse, *209 one of which was sold when Elizabeth decided to locate the summerhouse elsewhere, and the other two, consisting of two undersized lots separated by a middle lot, were sold when petitioners were not able to buy the middle lot. These properties were acquired and held for a different purpose from the other properties purchased by petitioners. These properties were not held primarily for sale to customers at the time of sale. A person engaged in the trade or business of selling real estate can hold certain property for reasons unconnected with his business. The three properties which were purchased by petitioners as prospective sites for a summerhouse were held by them as capital assets. Walter R. Crabtree, supra.The gains from these sales, $2,326.22 in 1954 and $45.95 and $545.85 in 1955, were properly reported by petitioners as capital gains. On the basis of the entire record, we have found as an ultimate fact that all of the real properties sold by petitioners in 1954, 1955, and 1956, except the three properties purchased as a site for a summerhome were held primarily for sale to customers in the ordinary course of petitioners' trade or business, and we so hold. The *210 three properties originally purchased as a site for a summerhome were not so held and were capital assets at the time of their sale. Petitioners on their income tax returns for 1954, 1955, and 1956 showed expenditures for medicine and drugs of $320# #36v# and $515, and other medical expenses of $811.19, $987.29, and $2,097.48, respectively. Respondent reduced the claimed expenditures for medicine and drugs by $120, $165, and $315, respectively, and reduced the other claimed medical expenses for the years 1955 and 1956 by $297.01 and $178.31, respectively. Respondent also adjusted the amount deductible for each of the 3 years because of the determined increase in petitioners' adjusted gross income. Petitioners have presented no evidence with respect to their expenditures for medicine or drugs. Petitioners submitted cancelled checks and schedules of claimed cash payments with respect to their claimed other medical expenses. For 1955 respondent disallowed $297.01. Among the claimed expenditures is an amount of $197.24 paid by check to a hotel. Even if this amount represents an expense incurred when William traveled out of town for medical treatment, it is not deductible. Commissioner v. Bilder, 369 U.S. 499 (1962). *211 Also claimed for 1955 is a $49.77 amount paid by check to Margaret Kisse for "care of children." The record indicates that the care for which this amount was paid was in the nature of baby sitting. Such expenses are not deductible as medical expenses. Ochs v. Commissioner, 195 F. 2d 692 (C.A. 2, 1952), affirming 17 T.C. 130 (1951). Also for 1955 petitioners submitted a list of cash expenditures totaling $142. These expenditures are not otherwise supported. One item therein of $50 is denominated "Expenses travel, food, etc." There is nothing in the record to show that any portion of this amount was for transportation as distinguished from food or lodging. For 1956 respondent disallowed expenditures of $178.31. Petitioners' claimed medical expenditures for 1956 include items totaling $266.29 paid to two different hotels. There is nothing in the record to support petitioners' claim that these amounts are deductible. Commissioner v. Bilder, supra. Petitioners have failed to show error in respondent's determination respecting medical expenses except to the extent that any reduction in the income as determined by respondent results in a reduction *212 of the excluded portion of medical expenses. Respondent has added the amounts of $400 and $125 to petitioners' income for the years 1955 and 1956, respectively. These sums represent legal fees paid to William in conjunction with the sale of real estate by petitioners. These amounts had been deducted by petitioners as a selling cost for properties sold in the taxable years 1955 and 1956. It is not clear from respondent's notice of deficiency whether the adjustments represent the disallowance of the claimed deduction or the inclusion of additional legal fee income in William's income from his practice of law. However, on brief respondent asserts that the adjustment represents unreported legal fee income. William's explanation was that when the proceeds of a real estate transaction were received, he placed the amount in a trust account and then would draw a check against this sum to pay his legal fees. As to the $400 and $125 amounts in issue, the proceeds of the sales stood in trust accounts during the taxable years in issue but William did not draw against the account for his fee. From what appears in the record, the $400 and $125 amounts due and owing to William were available for *213 him to take. There were no conditions militating against his drawing down the fees in the year in which they were made available. Petitioners constructively received the amounts in the years as respondent has determined. For the taxable year 1954 petitioners claimed entertainment expenses of $1,555.45. Respondent has allowed entertainment expenses of $1,030.45 for 1954. The only support petitioners have offered for the additional deduction is William's general statement to the effect that the $1,555.45 amount claimed by them is reasonable. This testimony is too general to support the claimed deduction. Reginald G. Hearn, 36 T.C. 672 (1961), affd. 309 F. 2d 431 (C.A. 9, 1962). Decision will be entered under Rule 50. Footnotes
*. This figure includes a $1,050 gain omitted from petitioners' income tax return but which is conceded by them to be includable in the year 1955.↩
*. Date shown as 3/14/62 on Stipulation of Facts. ↩
**. Excluding sale of 9 acres of vacant land.↩
1. Three other items reported on petitioners' tax returns merely represent additional installment payments on transactions reported in another year here in issue. Another item involved a claimed $810 loss on the sale of an automobile. Petitioners reported the loss as a capital loss. The effect of respondent's determination is to treat the loss with certain adjustments as a regular loss concurrent with respondent's treating the gain on the sale of the real estate as regular income. Petitioners do not question respondent's treatment of the automobile loss.↩