SAPPHIRE LANDS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent GARNET LANDS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sapphire Lands, Inc. v. Commissioner
Docket Nos. 1587-70, 1588-70.
United States Tax Court
T.C. Memo 1973-23; 1973 Tax Ct. Memo LEXIS 264; 32 T.C.M. (CCH) 82; T.C.M. (RIA) 73023; February 1, 1973, Filed *264 The petitioners were organized to subdivide and develop land, and from 1958 to 1965, they held certain land for the purpose of subdividing it and selling lots at retail. In 1966, such land was rezoned, and plans for subdividing the land were adopted. In 1967, four parcels of the land were sold, and in 1968, eight parcels were sold. Held, the petitioners have failed to show that during 1967 they were not holding the land primarily for sale to customers in the ordinary course of business. deQuincy V. Sutton, for the petitioners. Wm. O. Lynch, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The respondent determined a deficiency of $21,333.83 in the Federal income tax of Sapphire Lands, Inc., for the year ended November 30, 1967, and a deficiency of $584.35 in the Federal income tax of Garnet Lands, Inc., for the year ended November 30, 1967. The only issue for decision is whether during 1967 the petitioners held certain land primarily for sale to customers in the ordinary course of business. FINDINGS OF FACT Some of the facts were stipulated, and those facts are so found. The petitioners, Sapphire Lands, Inc. (Sapphire), *265 and Garnet Lands, Inc. (Garnet), each had its principal place of business in Metairie, Louisiana, at the time its petition was filed in this case. Each filed its Federal corporate income tax return for the year ended November 30, 1967, with the district director of internal revenue, New Orleans, Louisiana. A taxable or fiscal year of the petitioners will be identified by the calendar year in which it ends. Joseph Marcello, Sr., died in 1952, and on or after July 1, 1955, a State court ordered that his widow be 3 recognized as the owner of one-half of his property and as the holder of a life estate in the other half of such property. The court also ordered that each of the nine children of Joseph Marcello, Sr., be recognized as the owner of an undivided one-ninth interest in the property which was subject to their mother's life estate. Included in such property was a tract of approximately 183 acres of land located in Jefferson Parish, Louisiana. In late 1958, such land was surveyed and divided into 9 parcels of approximately 20.333 acres each. Nine new corporations were organized, including (in addition to Sapphire and Garnet) corporations named Gems, Inc., Topaz Lands, *266 Inc., Amethyst Lands, Inc. (Amethyst), Emerald Lands, Inc. (Emerald), Pearl Lands, Inc. (Pearl), Ruby Lands, Inc., and Moonlight, Inc. Such corporations will sometimes be referred to as the Gem corporations. Each of such corporations purchased from Mrs. Marcello, Sr., and her children one of such parcels of land on December 26, 1958. The consideration for the transfer of each parcel was a promissory note for $111,111.11, payable in 10 annual installments and bearing interest at a rate of 6 percent per year. Each note was secured by a first mortgage and a vendor's lien against the particular parcel of land involved, and each was personally endorsed 4 by James J. Culotta, a general contractor and president of the 9 corporations. According to their charters, the Gem corporations were formed for the purpose of subdividing and developing land, and each purchased its parcel of land with the intent of developing it into a residential subdivision. Development was to proceed from the parcels in the back of the 183-acre tract to those in the front. Since their inception, the corporations have been under common ownership, and from shortly after December 23, 1958, to February 26, 1965, Mr. *267 Culotta and Mr. Joseph Connolly each owned 50 percent of the stock of each of the 9 corporations. During Mr. Culotta's tenure as president, many proposals for the development of the land held by the corporations were considered. However, due to financial reverses which Mr. Culotta incurred in other developments, he never completed any development of the land. A 16-inch natural gas line and a main water line were located with-in the boundaries of the land, and discussions were held with local authorities about the possibilities of utilities service being extended to the land by the parish (a Louisiana parish is comparable to a county elsewhere). Subdivision plans and zoning changes were also considered by the corporations, and in 1959, the corporations granted 5 a right-of-way servitude through their land to the local water district. Sometime prior to October 16, 1961, Mr. Culotta acquired land adjacent to that owned by the Gem corporations and extended Claire Avenue, which ran through the acquired land, for the purpose of affording ingress to the land of the Gem corporations. On July 11, 1961, the land owned by Gems, Inc., was subdivided, and on October 16, 1961, 12.25 *268 acres of its land were sold to the Roman Catholic Church of the Diocese of New Orleans for $110,000 in cash. The use of this land for church purposes was contemplated in a plan of subdivision for the entire 183 acres prepared in 1958, and Mr. Culotta believed the presence of a church would be of value in developing the remaining land owned by the corporations. Some of the proceeds of the sale were used to pay the debt owed by the corporations on the 1958 notes to the Marcello heirs. At the beginning of 1965, the Gem corporation were in default on their debt to the Marcello heirs, and on February 25, 1965, Mr. Culotta resigned as president of the corporations and pledged his stock to Carlos Marcello (Mr. Marcello), the legal representative of the Marcello heirs, as further security for the debt. At this time, Mr. Culotta believed that the corporations were about to 6 sell the remaining approximately 171 acres of land for $1,630,000. Also on February 25, 1965, Mr. Connolly formally surrendered his stock to the corporations and such stock was reissued, in equal portions, to Jefferson D. Hampton II, a son-in-law of Mr. Marcello; Joseph C. Marcello, a son of Mr. Marcello; William *269 J. Robards, a son-in-law of Mr. Marcello; and Michel A. Maroun, a lawyer for the Marcello family. According to the corporate minutes, the consideration for the reissuance of the stock was services performed or to be performed, but apparently no such services were ever performed. Since February 25, 1965, Mr. Hampton has been president of the Gem corporations, but during such time, he generally acted as a representative of the Marcello heirs. During June 1965, plans for the development of the approximately 171 acres were proceeding, and engineering work preliminary to the submission of an overall subdivision plan was being completed. By this time, arrangements had been made for title insurance in connection with the development of the land, and all necessary title examination work had been done. On July 8, 1965, the Gem corporations borrowed $300,000 from Guaranty Bank and Trust Company (the bank). The loan was secured by collateral mortgages against their land, which were signed 7 by the president of the corporations and by Mr. Marcello as representative of the heirs. The heirs also guaranteed the loan and subordinated their claims against the corporations. The mortgages *270 provided for the release of specific lots, into which the land might be subdivided, upon payment of a designated portion of the mortgage debt. Part of the loan proceeds was intended to be used to pay Federal income tax deficiencies of the Marcello heirs, and at the time that application was being made for the loan, the attorney for the Gem corporations informed the bank that the corporations intended to subdivide and develop the land. During 1965, the corporations conveyed to the parish the necessary rights-of-way through their land for the extention of Lapalco Boulevard, a major street, and during that year or 1966, the parish authorities raised the funds necessary for the extension of the street and accompanying water and sewer lines. In April or May of 1966, a request for a change in zoning with respect to the land fronting on the north side of Lapalco Boulevard was filed with the office of the planning director of the parish, and on July 5, 1966, the zoning for such land was changed from single-family residential to neighborhood commercial. This rezoning enhanced the value of the petitioners' land, 8 as it encompassed most of the land held by Sapphire and some land held *271 by Garnet. In June 1967, a plan for resubdivision of the land held by the Gem corporations was completed, and on June 29, 1967, it was approved by the Jefferson Parish Council. Pursuant to such plan, the petitioners dedicated streets in 1967. During 1967, the parish commenced construction of Lapalco Boulevard and a sewerage treatment plant which would serve the land of the corporations. Also during that year, Mr. Marcello, as representative of the heirs, retained the services of a realtor to find a buyer or buyers for the corporations' property. Except as to price, the realtor was given complete discretion in selling the property, and he had the power to sell all or only part of it. Four sales were arranged by the realtor during 1967. Each sale involved a parcel of land which fronted on the proposed extension of Lapalco Boulevard, and which was not less than 1.5 nor more than 1.9 acres in size, and each was conditioned on the seller's obtaining authority for a resubdivision of the involved parcel. Such resubdivision authority was granted, subject to the condition that the resubdivision was for purposes of sale only and that no development would be permitted unless offsite *272 9 improvements were made. Two of the sales were made by Sapphire for a total cash consideration of approximately $107,000. The contracts for these sales stated that the utilities to be installed along Lapalco Boulevard would be paid for by the State and that those along another proposed street in the subdivision would be paid for by the purchasers. The other two sales were made jointly by Sapphire and Garnet for a total consideration of approximately $135,000 consisting of approximately $73,700 in cash and the remainder payable in 3 years. One such sale was for $81,900 which included a downpayment of $20,475. Nearly $94,000 of the proceeds from the 4 sales was used to reduce the principal of the $300,000 debt owed to the bank. The bank was not demanding payment of the debt but it had raised the rate of interest on the note. On January 4, 1968, another portion of the land held by Gem corporations was zoned commercial and multi-family residential, and on January 10, 1968, another plan for the resubdivision of a portion of the land belonging to the corporations was completed. Such plan was approved by the Jefferson Parish Council on March 7, 1968. During March 1968, Garnet *273 dedicated a portion of its land as a right-of-way for the purpose of widening a street. 10 In March 1968, the corporations made 8 sales. On March 1, Garnet and Emerald made 2 sales. The first was of a parcel of approximately 2.5 acres for $57,746.00 in cash, and the second was of a parcel of similar size for $72,746.00, consisting of $30,000.00 cash, $20,000.00 as cancellation of debt owed, in part, by Mr. Marcello, and $22,746.00 payable in 3 annual installments. On March 8, Garnet, Sapphire, and Emerald sold a parcel of approximately 4.9 acres to a partnership, a member of which was a son of Mr. Marcello. The consideration was $120,000.00, to be payable in 3 annual installments beginning in 1969. On March 14, Garnet and Emerald sold a parcel of approximately 4.5 acres to one of the Marcello heirs for a consideration of $131,536.00, consisting of $1,000.00 in cash and a $130,536.00 note payable on or before 3 years after the sale. On March 19, the same 2 corporations sold a parcel of approximately 2.3 acres for a consideration of $75,662.25, including a downpayment of $65,662.25, and on March 21, they sold a parcel of approximately 2.4 acres for $79,395.00 payable in 3 equal *274 annual installments beginning in 1969. On March 27, Sapphire sold a parcel of approximately 1.6 acres for a consideration of $37,800.00, consisting of a downpayment of $3,000.00 and $34,800.00 to be paid in 60 monthly installments. On the 11 next day, it sold a parcel of approximately 1.5 acres to a corporation, the president of which was a son of Mr. Marcello, for a consideration of $34,829.00, consisting of a $7,500.00 downpayment and $27,329.00 payable in 60 monthly installments. In each of the years 1966, 1967, and 1968, the board of directors of the Gem corporations adopted the following joint resolution: WHEREAS, these corporations intend to develop said property [the property acquired by the corporations in 1958] for residential and commercial use by subdividing the same and installing streets and off site improvements, and WHEREAS, in connection therewith it is necessary that application be made for certain zoning changes and for approval of subdivision plans, NOW, THEREFORE, BE IT RESOLVED, that these corporations do jointly undertake to develop the hereinabove described property, and that Mr. Jefferson D. Hampton, II, President of each of these corporations, *275 be and he is hereby authorized and directed, on behalf of these corporations, to do all and whatsoever may, in his sole and uncontrolled discretion, be necessary and proper in order to accomplish such purpose * * * BE IT FURTHER RESOLVED, that all acts and things which the said President may lawfully do hereunder be and the same are hereby ratified and confirmed, and declared to be the lawful acts and deeds of these corporations. On December 4, 1968, Mr. Culotta transferred his 50 percent of the stock of the Gem corporations to Mr. 12 Marcello, as representative of the Marcello heirs, in consideration for his release by the heirs of all personal liability on the 1958 notes of the corporations. In April 1969, the Marcello heirs formed the Louisa Corporation and 1 share of stock in such corporation was issued to each of the children of Mr. Marcello, Sr., and 9 shares to his widow. There was then transferred to the Louisa Corporation the outstanding shares of stock of the Gem corporations. On August 25, 1969, Garnet, Emerald, and Pearl sold a parcel of approximately 20 acres to one of the Marcello heirs for a consideration of $310,000.00, consisting of a $10,000.00 downpayment *276 and $300,000.00 payable on or before 5 years after the sale. During either 1968 or 1969, the extension of Lapalco Boulevard through the land of the Gem corporations was completed. On March 8, 1971, a plan for the resubdivision of portions of the land belonging to Sapphire and Amethyst was completed, and it was approved on March 11, 1971, by the Jefferson Parish Council. On March 24, 1971, Sapphire and Amethyst sold 2 parcels of land consisting of approximately 17 acres to the S-C Development Company, a partnership, for $517,754.16 in cash. Prior to 1968, the Gem Corporations had no bank accounts and they used the account of Mrs. Marcello, Sr., 13 for their transactions. Prior to 1967, they had no records other than their Federal income tax returns. At the time of trial, Mrs. Marcello, Sr., was dead, and $100,000 was still owing to the bank on the 1965 loan. The petitioners, on their 1967 Federal corporate income tax returns, treated the sale proceeds which they received in 1967 as long-term capital gain, and the respondent in his notice of deficiency took the position that the proceeds were taxable as ordinary income because the property which was sold was held primarily *277 for sale to customers in the ordinary course of business. In the notice of deficiency, the respondent also made certain adjustments in the bases used for computing the gains on the sales of property, but those adjustments have been accepted by the petitioners. OPINION The issue for decision is whether during 1967 the petitioners held the lands that they sold in that year primarily for sale to customers in the ordinary course of business. In their reply brief, the petitioners state: There has never been a dispute between the parties respecting the fact that these corporations were formed and maintained from 1958 to at least 1965 for the purpose of selling 14 subdivided land in retail lots. The entire gravamen of this cause centers around the purpose for which the land was primarily held by the corporation during the taxable year 1967 at issue. That purpose, according to petitioners, was solely the purpose of holding for increase in value after the heirs received control of the land and the corporations in 1965. * * * That the petitioners were in the business of selling land to customers until at least 1965 is supported by the uncontradicted testimony of Mr. Culotta to *278 the effect that while he was president of the corporations, they held the 183-acre tract of land for sale to customers in the ordinary course of business. The resolution of the issue in this case, thus, depends on whether the petitioners have proved that their purpose for holding the property changed between the time that the heirs gained control and the 1967 sales, so that they were no longer holding the property for sale to customers in the ordinary course of business. Herzog Building Corp., 44 T.C. 694, 704 (1965); see Maddux Construction Co., 54 T.C. 1278 (1970); Eline Realty Co., 35 T.C. 1, 6 (1960). We hold that the petitioners have not demonstrated such a change of purpose. Section 1221(1) of the Internal Revenue Code of 1954 excludes from the definition of a capital asset "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," and in 15 Malat v. Riddell, 383 U.S. 569, 572 (1966), the Supreme Court held that "as used in § 1221(1), "primarily" means "of first importance" or "principally."" The question of whether property is being held "primarily" *279 for sale to customers in the ordinary course of business is a factual one and many factors have been considered by the courts in resolving such question. These factors include: (1) The purpose for which the property was initially acquired; (2) the purpose for which the property was subsequently held; (3) the extent to which improvements, if any, were made to the property by the taxpayer; (4) the frequency, number, and continuity of sales; (5) the extent and nature of the transactions involved; (6) the ordinary business of the taxpayer; (7) the extent of advertising, promotion, or other active efforts used in soliciting buyers for the sale of the property; (8) the listing of property with brokers; and (9) the purpose for which the property was held at the time of sale. See James G. Hoover, 32 T.C. 618 (1959); Ralph J. Oace, 39 T.C. 743 (1963). * * * [Maddux Construction Co., supra at 54 T.C. 1284.]
None of these factors by itself is determinative, but rather all the factors in a particular case must be considered. Maddux Construction Co., supra; W. T. Thrift, Sr., 15 T.C. 366 (1950). After February *280 1965, when the heirs gained control of the petitioners, there was no change in the corporate charters which stated that the corporations were organized to subdivide and develop land. Indeed, in June 1965, the attorney for the corporations represented to 16 the bank that the corporations intended to develop the land, and this intent was reaffirmed by corporate resolutions in 1966, 1967, and 1968, which provided that "these corporations intend to develop said property * * * by subdividing the same and installing streets and off site improvements * * *." Other corporate actions also fail to show that the corporate purpose had changed. In June 1965, the corporations were working on plans to develop the land. Title insurance had been obtained, and engineering work preliminary to a resubdivision was being completed. In 1966, a portion of the corporations' land was rezoned for commercial development, and in 1967, the corporations took such rezoning into account and adopted a plan for resubdivision, which included the dedication of streets. A realtor was retained to sell part or all of the land, and 4 sales were made in 1967. In the following year, the corporations secured rezoning *281 of another portion of the land for commercial and multi-family development, dedicated an additional street, requested an additional resubdivision, and made 8 sales for a total consideration of over $600,000. The petitioners, however, contend that the corporations held the land for appreciation in value during 1967, and as evidence of such intent, they rely on the testimony 17 of Mr. Marcello. In essence, Mr. Marcello testified that after February 25, 1965, he, as representative of the heirs, was in complete control of the corporations; that the shareholders, directors, and officers of the corporations were mere nominees of the heirs; that the sales in 1967 and 1968 were made only to pay debts; that the corporations did not develop the land; and that, as the controlling force of the corporations, he considered the land to be held solely for appreciation in value. Although he claimed to be in control of the corporations and the directors were allegedly mere nominees, Mr. Marcello could not explain the corporate resolutions passed by the directors which stated that the corporations intended to develop land. The explanation offered by the petitioners in their briefs for these *282 resolutions is that they were required to give Mr. Hampton the necessary authority to fulfill the obligations incurred by the corporations in the sales required to secure funds to pay the debts of the heirs. Yet, the authority granted to Mr. Hampton was much broader than that needed to carry out the obligations of the sales contracts, and if that were the reason for the resolutions, it was surely not necessary to grant Mr. Hampton authority to perform acts which were inconsistent with the purposes of the corporations in holding the lands. 18 Thus, we are not convinced by such explanation of the reasons for the resolutions. Nor do we believe that the sales in 1967 were required to be made to pay debts. Although a large portion of the cash proceeds from the 1967 sales was used to pay a portion of a $300,000 debt owed to the bank, the bank was not demanding payment of such debt, and after land was sold for approximately $1,700,000, $100,000 of the debt was still outstanding at the time of trial. Furthermore, the real estate agent was authorized to sell all or part of the lands, not just enough to make payment on the debt to the bank, and he was given broad discretion in arranging *283 the terms of the sales. In fact, one of the sales in 1967 was made for a cash payment of only $20,475 and deferred payments of $61,425 plus interest. Moreover, if property is held primarily for sale to customers in the ordinary course of business, the nature of such holding is not changed because the actual sale was forced by the necessity to pay a debt. [1] Cf. Donald J. Lawrie, 36 T.C. 1117 (1961). *284 Footnotes
1. See L. P. Barney, 26 T.C.M. 109, 36 P.-H. Memo. T.C. par. 67,017 (1967); William S. Grimaldi, 22 T.C.M. 739, 32 P.-H. Memo. T.C. par. 63,156 (1963). 19 The petitioners repeatedly and vigorously objected to the admission of evidence concerning the sales and other activities of the corporations in 1968 and subsequent years on the basis that such years were not before us. However, it has been held that the Court may consider activities in a subsequent year when such information tends to establish a pattern that began in the year in issue. See Thompson v. Commissioner, 322 F. 2d 122 (C.A. 5, 1963), affg. on this issue 38 T.C. 153 (1962). In this case, the events in 1968 and later years are consistent with and reinforce the indications in 1967 that the lands were being held for sale at retail. Although the first sales occurred in 1967, the subsequent events make clear that these sales were merely the first ones to be made in the overall plan of subdividing and selling the lands. The rezoning and resubdividing in the later years support the conclusions which we drew from the statement of the attorney in 1965 and the corporate resolutions adopted in 1966 and 1967, as well as in 1968. We also disagree with the petitioners' contentions that they did nothing more than subdivide the land and dedicate streets and that accordingly they were not in the business of holding the property primarily for sale. The failure to develop property extensively does not require that such property be treated as a capital asset. 20 C. E. Mauldin, 16 T.C. 698, 710, 711 (1951), affd. 195 F. 2d 714 (C.A. 10, 1952); see Fritz Thompson, 38 T.C. 153(1962), affd. on this issue 322 F. 2d 122 (C.A. 5, 1963); O'Donnell Patrick, 31 T.C. 1175 (1959), affd. 275 F. 2d 437 (C.A. 7, 1960); August Engasser, 28 T.C. 1174 (1957). We realize that it has been held that under some circumstances, the subdivision of land and dedication of streets may be indicative of nothing more than an attempt by an investor to liquidate a portion of his holdings in accordance with local or State resubdivision regulations. See Wellesley A. Ayling, 32 T.C. 704 (1959); Allen Moore, 30 T.C. 1306 (1958); W. T. Thrift, Sr., supra.However, those cases are distinguishable. In the present case, the Gem corporations were formed for the purpose of subdividing and developing property, the tract of land purchased from the Marcello heirs was the only land the petitioners ever held, all of the petitioners' income in 1967 arose from the sales of land in that year, corporate resolutions in 1966, 1967, and 1968 stated that the corporations intended to develop the property by subdivision, and necessary improvements to the land were being made by the public authorities. Moreover, the petitioners have admitted that from 1958 to February 1965, they held the property primarily for sale to customers in the ordinary course of business, and they have not shown that such 21 purpose for holding the property changed prior to the sales in 1967. Furthermore, we cannot accept the petitioners' argument that the corporations had nothing to do with rezoning the portion of land in which most of the 1967 sales occurred. Prior to 1965, the corporations had considered such rezoning, and an application for rezoning the petitioners' land was filed in 1966. In 1967, at least 3 of the sales were conditioned on such rezoning, and in 1966, 1967, and 1968, the board of directors stated that it was necessary to apply for rezoning and authorized Mr. Hampton to do so. Obviously, the rezoning did enhance the value of the land. The petitioners argue that there has been no showing that they sought the rezoning, but since they had the burden of proving that they were not in the business of holding the property primarily for sale, they had, under the circumstances of this case, the burden of proving that they did not seek the rezoning - they cannot rely on the respondent's failure to show that they did seek the rezoning. Mr. Marcello's statement that the land was not being held for sale to customers in the ordinary course of business is entitled to little weight in light of his subsequent statement that the land was always available for 22 sale if the buyer met the asking price, and in view of the other evidence in this case, including Mr. Marcello's failure to explain the corporate resolutions regarding development, and his hiring a realtor to sell the land. Finally, the fact that only slightly less than 70 acres of the 183-acre tract had been sold by 1971 does not show that the land was held for investment. It appears that the Gem corporations were not in a hurry to sell the lands, and the failure to make more sales may be due to the fact that they did not wish to "flood" the market and wished to hold the lands for propitious sales. Decisions will be entered for the respondent. ↩