**LLOYD E. MITCHELL, IN-CORPORATED**

v.

**UNITED STATES of America.**

**Civ. No. 16558.**

United States District Court
D. Maryland.

Oct. 5, 1966.

Howard H. Conaway, George Gump and Arnold E. Kaufman, Baltimore, Md., for plaintiff.

Moshe Schuldinger, Atty., Dept. of Justice, Washington, D.C. (Mitchell Rogovin, Asst. Atty. Gen., and David A. Wilson, Jr., Atty., Dept. of Justice, Washington, D.C., and Thomas J. Kenney, U. S. Atty., Baltimore, Md., on the brief), for defendant.

THOMSEN, Chief Judge.

In this action for the recovery of income taxes alleged to have been wrongfully assessed, the issue is whether taxpayer's gains from the sale of real estate in 1958 and 1959 should be treated as capital gains or as ordinary income. Taxpayer contends that the several parcels of real estate sold during those years were "capital assets", as defined in sec. 1221, I.R.C. of 1954, 26 U.S.C.A. § 1221, which provides:

"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

Taxpayer was incorporated in Maryland in 1923, and has been a successful mechanical and acoustical contractor in the plumbing, heating, industrial piping, ventilating, air-conditioning and related fields. At all material times most of its stock has been owned by George W. Mitchell and his family, and Mitchell has controlled its operations.

Before 1944 taxpayer owned no real estate except the land and buildings used in its contracting business. In 1944 an auctioneer recommended to Mitchell the purchase of a parcel of unimproved land in the suburbs of Baltimore, and since taxpayer had available funds not then needed in its contracting business, Mitchell caused taxpayer to purchase the property for $116,179.19. During the years 1944 to 1957 taxpayer purchased a total of 16 tracts of land in the rapidly expanding Baltimore metropolitan area, at a total cost of $728,032. See the table attached hereto, marked Exhibit A. Taxpayer has purchased no land since 1957, but in 1958 and 1959 (the years in question in this suit) and in 1962 made sales of property purchased before 1958. In all, between 1945 and 1962 taxpayer made 84 sales of real estate, with net sales prices totaling $1,858,044, and total net gains of $1,229,506, as will appear from

Exhibit A.[1] Taxpayer's gross sales and gross profits from all sources and its taxable net income for each year also are shown on Exhibit A. Taxpayer's business as a mechanical and acoustical contractor expanded rapidly during the 1950's.

Of the 16 tracts of land purchased by taxpayer, six had been subdivided into lots before taxpayer purchased them, but taxpayer itself did not make any subdivisions or improvements. Taxpayer did not engage in any rezoning of the properties purchased, although it did elect, as it had a right to do, not to consummate the purchase of one tract when taxpayer was unable to obtain the desired zoning. Taxpayer did not advertise any of its land for sale, nor place it in the hands of a sales agent. Mitchell was the only officer of taxpayer who was concerned with the purchase and sale of the real estate, and he devoted less than 1% of his time to real estate matters. Taxpayer had no license as a real estate dealer and was not listed as such in the telephone book or elsewhere. Most of the sales were made to builders and others who learned from public records that taxpayer owned the lots or parcels they wished to buy, approached Mitchell, and made offers which he considered satisfactory.

Of the 84 sales, however, 21 were made to National Realty Corporation or corporations with the same or substantially the same stockholders, officers and directors as National. That corporation had been organized in 1946 to engage in real estate and building operations. Originally most of its shares were held by stockholders of taxpayer or members of their respective families. Additional shares were issued from time to time, but most of its shares have at all material times been owned by taxpayer, its stockholders and members of their families, although by no means all of the stockholders of taxpayer have owned stock in National and its related

companies. The operations of National were conducted by an experienced developer named Mohr, but, like taxpayer, National was dominated by Mitchell. The 21 sales made by taxpayer to National and companies related to National accounted for more than half of taxpayer's total gains from sales of real estate through 1959. Taxpayer's real estate sales in 1958 totaled $296,592; all were made to National or its related companies except one for $29,410, which was to an individual at cost.

The largest sale during the years 1958–1959, producing over 70% of the profit for those years, was part of a 95 acre tract of land at Relay, in the metropolitan area, southeast of the City. That tract had been purchased by taxpayer in 1948, and National had been granted an option for a part of the tract in 1953, which was exercised in 1958; other portions of the Relay tract had been sold to other builders from time to time before 1953. Taxpayer's sales of real estate in 1959 totaled only $17,142; one, for $15,255, was to a church.[2]

National had a real estate broker's license, and received a part of the commissions on 50 of the 63 sales to persons and corporations other than National and its related companies. The Court finds, however, that taxpayer had not placed any of those properties with National for sale, National had not advertised them, and National had not solicited or procured their sales, although it probably rendered some services to taxpayer in connection with the settlements. Essentially, it appears that Mitchell usually designated National to receive the share of the commission customarily paid to the seller's broker, since otherwise the entire commission would have gone to the buyers' brokers.

Taxpayer objected to the admission of the evidence dealing with the ownership,

---

1. Between 1945 and 1959 the figures would be: 82 sales, $1,454,434 net sales prices, and $893,293 net gains.

2. No sales were made in 1960 or 1961. Two sales were made in 1962: one, for

$5,900, to an individual; the other, for $297,710, to a corporation which has not been shown to have any relationship to taxpayer.

control and operations of National. The ownership and control were not such as to make National a subsidiary of taxpayer, nor should National's activities in building and developing real estate be considered as activities of taxpayer. Ralph E. Gordy, 36 T.C. 855 (1961); Gardens of Faith, Inc., T.C. Memo, 1964–178. But National did serve as a ready purchaser for much of taxpayer's land; and taxpayer served as a continued source of available land for National, without the need for National's stockholders to put up or borrow money to carry the land. The government does not contend that the prices charged by taxpayer for land sold to National were unreasonable or unfair to the stockholders of either company who were not stockholders of the other.

It is true, as taxpayer notes, that all of the cases cited in which sales to a related corporation have been considered material have been cases in which all or most of the shares of the purchaser were owned directly by the taxpayer or taxpayers. See e.g. Lakin v. Commissioner of Internal Revenue, 4 Cir., 249 F.2d 781 (1957); Patterson v. Belcher, 5 Cir., 302 F.2d 289 (1962), cert. den. 371 U.S. 921, 83 S.Ct. 289, 9 L.Ed.2d 230 (1962), reh. den. 305 F.2d 557 (1962); Burgher v. Campbell, 5 Cir., 244 F.2d 863 (1957). Nevertheless, in this case the relationship between the corporations and their stockholders is one of the factors which should be considered by the Court.

The statute—26 U.S.C.A. 1221(1), quoted in the first paragraph of this opinion—denies capital gain treatment to profits reaped from the sale of property held by the taxpayer *primarily* for the sale to customers in the ordinary course of his trade or business. In Malat v. Riddell, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966), the Commissioner urged a construction of "primarily" as meaning that a purpose may be "primary" if it is a "substantial" one. The Supreme Court rejected that contention, stating:

"As we have often said, 'the words of statutes—including revenue acts— should be interpreted where possible in their ordinary, everyday senses.' Crane v. Commissioner of Internal Revenue, 331 U.S. 1, 6 [67 S.Ct. 1047, 1051, 91 L.Ed. 1301]. And see Hanover Bank v. Commissioner of Internal Revenue, 369 U.S. 672, 687–688 [82 S.Ct. 1080, 1088–1089, 8 L.Ed.2d 187]; Commissioner of Internal Revenue v. Korell, 339 U.S. 619, 627–628 [70 S.Ct. 905, 909, 94 L.Ed. 1108]. Departure from a literal reading of statutory language may, on occasion, be indicated by relevant internal evidence of the statute itself and necessary in order to effect the legislative purpose. See, e. g., Board of Governors of Federal Reserve System v. Agnew, 329 U.S. 441, 446–448 [67 S.Ct. 411, 413–415, 91 L.Ed. 408]. But this is not such an occasion. The purpose of the statutory provision with which we deal is to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand (Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 52, 76 S.Ct. 20, 24, 100 L.Ed. 29) and 'the realization of appreciation in value accrued over a substantial period of time' on the other. (Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S.Ct. 1497, 1500, 4 L.Ed.2d 1617). A literal reading of the statute is consistent with this legislative purpose. We hold that, as used in § 1221(1), 'primarily' means 'of first importance' or 'principally.' " 383 U.S. 569, at 571, 86 S.Ct. at 1032.

In a recent case, Tidwell v. Commissioner of Internal Revenue, 4 Cir., 298 F.2d 864, 866 (1962), the Fourth Circuit said:

"No fixed formula exists for determining whether property is held primarily for sale to customers in the ordinary course of a taxpayer's business. Rather, a congeries of factors is to be considered and weighed, no one factor being necessarily decisive. Kaltreider v. Commissioner, 255 F.2d 833 (3 Cir. 1958); Stockton Harbor Indus. Co. v. Commissioner, 216 F.2d 638 (9 Cir.

1954), certiorari denied, 349 U.S. 904, 75 S.Ct 581, 99 L.Ed. 1241."

That statement is in line with the great weight of authority, which has emphasized that each case must be decided on its peculiar facts, and that a factor which controls one case may not control another. Certain factors, however, have been frequently referred to in other cases; they have been fully considered by this Court in the instant case and will be briefly discussed.

The *purpose* for which the first tract of land was acquired was investment— the hope that it would increase in value and could be sold at a profit as the City expanded. After National was incorporated, a year or two later, the possibility or likelihood of being able to sell some of the land to National or the companies related to it became a factor; but taxpayer continued to buy and to hold tracts of land for investment, and to sell all or part of such tracts to purchasers other than National who came forward with satisfactory offers.[3]

The *continuity* of purchases and sales has been considered a most important factor in some cases. In this case the purchases averaged a little over one tract a year, and total sales about six a year. The size and character of the properties must also be considered. Most of the purchases were of large tracts; the sales varied from narrow strips and single lots, through several lots to large tracts or parcels. This factor does not point clearly either way.

The *holding period* has been an important factor in some cases. Here, the several tracts purchased by taxpayer were held for varying periods before any sales were made therefrom. In some instances portions of the tracts were sold in a year or two; in other instances no sales were made for considerably longer periods, except for occasional small parcels to straighten lines, etc. No calculation of average time held would have much meaning in this case.

Taxpayer did not *develop or improve* any of the land. Six of the tracts had been subdivided before they were purchased by taxpayer, and some sales of one or many lots therefrom were made. But taxpayer did nothing to develop or improve those or any other tracts. In each instance the purchaser, whether National, another builder or an individual purchaser, did whatever developing or improvement was done.

Taxpayer did not *advertise or solicit* purchasers, itself, or through National or any other sales agent. Of course, National and the other builders who purchased land from taxpayer must have advertised and solicited purchasers for the houses they built on the land.

A *comparison* of the real estate transactions with other activities of the taxpayer has been found helpful in some cases. Here, the amount of real estate sales and the profits therefrom were small, as compared with the regular business of taxpayer, but they were not insignificant. The time spent by taxpayer's officers and employees in connection with the real estate transactions was slight—only 1% of the time of one officer, Mitchell, and, no doubt, a small portion of his secretary's time. The cost of the land held from time to time varied from $84,252 to $340,993. Those amounts are not insignificant, but they are not out of line with the capital which a concern the size of taxpayer might reasonably have available for investment in real estate or in stocks or bonds until it might be needed for other purposes.

The fact that land was sold from time to time after having been held for periods ranging from a few months to ten years or more does not prove that taxpayer was a dealer rather than an investor. Investors as well as dealers buy and sell stocks, bonds, real estate and other property with the hope of making a gain. Boykin v. Commissioner of Internal Revenue, 5 Cir., 344 F.2d 889 (1965). The basic question is

---

**3.** It should be noted again that the government does not contend that National was a subsidiary of taxpayer or that the prices at which taxpayer sold lots or tracts of land to National were not fair prices.

whether the property was "held by taxpayer primarily for the sale to customers in the ordinary course of his trade or business". As the Supreme Court pointed out in Malat v. Riddell, supra, we must construe the word "primarily" as meaning "of first importance" and "principally", and must differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand, and "the realization of appreciation in value accrued over a substantial period of time" on the other. After considering and weighing the "congeries of factors" involved in this case, I find that the real estate sold by taxpayer in 1958 and 1959 was not being held primarily for sale to customers in the ordinary course of its business, and that the gains from such sales should be treated as capital gains and not as ordinary income.

Counsel will prepare a proper judgment order.

Exhibit A

| | Purchase of Real Estate | Net Sales Prices of Real Estate | Net Gains from Sale of Real Estate | Taxable Net Income Per Return | Gross Sales All Sources | Gross Profits All Sources |
|---|---|---|---|---|---|---|
| 1944 | $116,179 | -0- | -0- | --- | $ 2,015,340 | --- |
| 1945 | 202,902 | $ 11,500 | $ 8,169 | $202,312 | 2,114,577 | $ 226,251 |
| 1946 | -0- | 63,815 | 20,521 | 582,106 | 3,684,289 | 235,750 |
| 1947 | 45,909 | 51,137 | 34,454 | 620,182 | 8,344,000 | 446,540 |
| 1948 | 17,500 | 95,275 | 31,505 | 111,012 | 3,055,291 | 763,000 |
| 1949 | 36,000 | 400 | 238 | 242,009 | 5,480,262 | 329,058 |
| 1950 | 54,735 | 82,930 | 38,156 | 619,644 | 8,178,406 | 449,191 |
| 1951 | -0- | 83,746 | 47,701 | 493,789 | 7,144,137 | 948,031 |
| 1952 | 74,488 | 50,046 | 43,180 | 518,827 | 7,978,035 | 848,736 |
| 1953 | -0- | 69,033 | 57,718 | 279,056 | 9,819,820 | 881,602 |
| 1954 | 49,897 | 46,253 | 23,708 | 345,386 | 5,831,669 | 601,872 |
| 1955 | -0- | 130,840 | 117,360 | 387,268 | 11,615,763 | 711,236 |
| 1956 | -0- | 363,311 | 127,361 | 886,226 | 27,860,731 | 1,068,889 |
| 1957 | 193,658 | 92,408 | 85,110 | 515,459 | 8,727,075 | 1,879,000 |
| 1958 | -0- | 296,592 | 242,659 | 284,777 | 10,858,409 | 1,393,309 |
| 1959 | -0- | 17,142 | 15,453 | 263,808 | 22,563,672 | 1,455,956 |
| 1960 | -0- | -0- | -0- | 195,179 | 19,114,841 | 1,352,981 |
| 1961 | -0- | -0- | -0- | | 24,344,552 | 1,120,554 |
| 1962 | -0- | -0- | -0- | --- | | |
| | 403,610 | 403,610 | 336,213 | | | |