L. P. Barney and Dora Barney v. Commissioner.
Barney v. Commissioner
Docket No. 711-66.
United States Tax Court
T.C. Memo 1967-17; 1967 Tax Ct. Memo LEXIS 242; 26 T.C.M. (CCH) 109; T.C.M. (RIA) 67017; January 31, 1967
Michael J. Hughes, 11 Edwards St., Helena, Mont., and George T. Bennett, for the petitioners. Walter John Howard, Jr., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following income tax deficiencies against the petitioners: Year
Deficiency
1961
$1,607.93
1962
1,202.64
1963
1,514.43
The two issues for decision are: (1) Whether gains realized by petitioners from the sales of lots during the years 1961 through 1963 are taxable as ordinary income or capital gain; and (2) whether the petitioners are limited to a $1,000 capital loss in 1963. Findings of *243 Fact Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. L. P. Barney and Dora Barney (hereinafter called L. P. or Dora individually or petitioners collectively) are husband and wife who reside in Helena, Montana. They filed joint Federal income tax returns for the years 1961, 1962, and 1963 with the district director of internal revenue at Helena, Montana. At all times relevant to this case, L. P. was engaged in the general construction and contracting business. He conducted this business as a sole proprietorship under the name of L. P. Barney Construction Company (sometimes hereinafter called the construction company) with principal offices and place of business in Helena, Montana. This company, well known in the Helena community, was incorporated subsequent to the years here involved. The comparative operating statements of L. P. Barney, doing business as L. P. Barney Construction Company, attached to petitioners' joint Federal tax returns, show profits from the sales of lots as follows: Year
Profit on sales of lots
1960
$4,263.40
1961
7,604.11
1962
6,581.35
1963
6,807.72
*244 Prior to her marriage to L. P. and for a short time thereafter, Dora was employed in Helena by various law offices and by a loan company. At these places of employment she had many occasions to go to the courthouse and search out records with respect to the acquisition of property on a tax deed. During the years 1961 through 1963 Dora was a housewife. She did not actively participate in the business of L. P. Barney Construction Company and was never on its payroll. On January 23, 1951, petitioners purchased 13 lots in Broadwater Addition No. 2 to the City of Helena (hereinafter called Broadwater) by tax deed from Lewis and Clark County, Montana. They took title as joint tenants with the right of survivorship. These lots were purchased for the purpose of relocating and expanding the construction company's offices and shops. After learning the price paid for the 13 lots, and because of her familiarity with the requirements of purchasing land on tax title, Dora became interested in acquiring similar tax lots in Broadwater. Consequently, on September 18, 1951, petitioners purchased 78 lots in Broadwater by tax deed from Lewis and Clark County, Montana, taking title thereto as joint *245 tenants with the right of survivorship. These lots were owned by the county because the owners had allowed the taxes to become delinquent. The funds for this purchase were obtained by Dora through a loan from her father, Charles W. Niswanger. Broadwater is located in the northwest area of Helena, north of the Missoula highway. Although it was subdivided and platted in 1890, Broadwater was not developed when petitioners purchased their lots. A sewer line reached the corner of Waukesha and Grant where the construction company's warehouse and shop were located, but reached none of the subsequently purchased 78 lots. Waukesha Street was the only street cut through Broadwater, and the 78 lots were unimproved native land. Subsequent to the above purchases, but prior to 1959, petitioners requested the City of Helena to determine the location of and grade the streets which had been platted in Broadwater. Then, in 1959, the City of Helena gave notice of a "Resolution of Intention" to create a special improvement district (hereinafter called S.I.D.) covering the portion of Broadwater which included all of the land therein owned by petitioners. This "Resolution of Intention" was a proposal *246 for the construction of streets, curbs and related paving. The City Council, after taking all necessary legal steps which included obtaining the concurrence of the owners of more than 60 percent of the front footage in the district, passed a resolution creating such S.I.D. It then ordered the improvements and an annual levy of assessment and tax for the payment of principal and interest on the requisite S.I.D. warrants. This led to the paving and curbing of streets in Broadwater and the installation of sewers and water. The assessments attached thereto led to an increase of approximately eight times the property taxes previously paid by petitioners on their lots in Broadwater. Petitioners neither voted for nor against it, although they owned enough front footage in Broadwater to have defeated the "Resolution of Intention" if they had so chosen. Their stated reason for not voting against it was their intent not to impede progress in Helena. During the period from 1952 through 1960 the petitioners sold real property from Broadwater to the following number of purchasers: Year
Number of sales
1952
1
1953
2
1954
0
1955
1
1956
4
1957
3
1958
4
1959
2
1960
4
*247 In 1961, L. P. received a letter from a Mr. Bond of Seattle, Washington, who stated his desire to dispose of lots located in Block 32 of the Lennox Addition (hereinafter called Lennox) in Helena. A mutual friend had suggested that Bond contact L. P. After discussing the purchase of these lots, the petitioners offered what they considered a very low price for them. The offer was accepted, and petitioners purchased these lots on April 20, 1961, taking title as joint tenants with the right of survivorship. On February 28, 1962, petitioners acquired Blocks 39, 40, and 41 in Lennox, taking title as joint tenants with right of survivorship. This property was acquired from a local realtor who contacted them and offered to sell at what petitioners considered an excellent price. Petitioners cosigned the note necessary to raise money for this purchase. Lennox was platted in 1890. The blocks purchased by petitioners either had an available sewage system or grids in the streets for sewage. Otherwise the lots were unimproved at the time of purchase. On November 23, 1963, petitioners bought 28 lots in Blocks 82 and 145 of the Cannon Addition in Helena. Petitioners disposed of lots in Broadwater *248 by at least 7 sales in 1961, 5 sales in 1962, and 1 sale in 1963. All were treated by petitioners as capital gains. They made 2 sales in Lennox in 1961, the gains from which were treated as ordinary income; 5 sales in 1962 which were treated as capital gains, and 2 which were treated as ordinary income; and at least 14 sales in 1963, all of which were reported as capital gains. Petitioners also made 3 sales in the Cannon Addition in 1963, all of which were reported as capital gains. Factors which influenced persons to build in Broadwater included the proximity of schools, the special improvements, the type of neighborhood, the proximity of friends and fellow employees, and the type of homes being built in Broadwater, especially those built by L. P. Barney, who had an excellent reputation. Factors which influenced persons to buy in Lennox included the proximity of an elementary school and the classification of that area as a "Triple A" location, meaning that only one-family units could be located there and that no rental units could be constructed. Approximately 75 to 80 percent of the construction done by the L. P. Barney Construction Company was of single-family dwelling units *249 as opposed to commercial work and remodeling. The company employed a three man office staff and 15 to 25 men in actual construction work, the number varying with the season of the year. The company built between 28 and 30 homes during each of the years 1961 through 1963, and it built an average of 25 homes a year in the years between 1956 and 1965. It is the largest construction company in Helena. L. P. started in the construction business as a carpenter and craftsman and has been in the construction business for over 35 years. During the years here involved, he spent most of his time supervising the company's construction crews. He also met with his office staff each morning and he assumed ultimate responsibility for its activities. L. P. and his office staff were knowledgeable in all facets of the construction business. They would provide a design and plans for the home to be constructed. They would inform the customer of and arrange all necessary financing. As an additional service to prospective customers, they maintained a complete list of all available lots in Helena, their price, and their location. This list included all of the lots owned by petitioners in Broadwater and *250 Lennox. All members of the company's office staff were aware of the lots owned by petitioners in those areas. There was no direct promotion or advertising by petitioners of lots in Broadwater and Lennox during the years in question. However, petitioners set what they considered to be a fair price for each lot and were willing to sell if a purchaser offered that price. Purchasers of the lots learned of their availability from the office staff of L. P. Barney Construction Company, from other owners, and from public records. Most purchasers of petitioners' lots during the years 1961, 1962 and 1963 contracted for a L. P. Barney Construction Company home to be built either concurrently with the purchase of their lot or soon thereafter. While the construction company never advertised such a package deal, it was often more convenient to the purchaser since it entailed dealing with only one party or because a bank would finance both the lot and the home in one transaction. Some customers, however, purchased their lots from third parties and the construction company then built houses on them. During the years in question the construction company built one or two "model homes" in Lennox *251 on lots owned by petitioners and, after using them for promotional purposes, sold the lots and homes thereon in a package transaction. The sales of these lots were reported as ordinary income by petitioners. The comparative operating statements of L. P. Barney, doing business as L. P. Barney Construction Company, attached to petitioners' joint Federal income tax returns, showed the following advertising and promotional expenses: Year
Amount
1960
$3,256.72
1961
5,310.29
1962
4,109.86
1963
4,548.30
A portion of these expenses went to the construction and promotion of the model homes built upon the lots owned by petitioners during those years. Ultimate Findings Petitioners are dealers in real estate. The lots in Broadwater and Lennox were held by petitioners primarily for sale to customers in the ordinary course of business. Opinion Petitioners contend that the lots sold in the Broadwater and Lennox additions during 1961, 1962 and 1963 were not held by them primarily for sale to customers in the ordinary course of their business. They argue that Dora was a housewife who was not engaged in any business activity or pursuit, and that the sales in question *252 did not occur in the ordinary course of L. P.'s construction business. They also argue that they invested in unimproved real property solely with the expectation that it would appreciate in value and that it was sold without any development or promotional activities on their part. Alternatively, even if L. P. is deemed to have sold the lots as part of his construction business, the petitioners contend that since title was held by them as joint tenants with the right of survivorship, and since Dora was not involved in the construction business, they owned equal shares under Montana law and therefore gains on the sales belonged to them equally as their own separate property and as such should be taxed separately. Respondent, on the other hand, maintains that petitioners are dealers in real estate, holding property in Broadwater and Lennox primarily for sale to customers in the ordinary course of their business. He claims that the construction company acted as the agent of petitioners to assist in their business of selling building sites. In the alternative, he claims that the lots available for sale from petitioners were an integral part of the construction company business and that *253 the gains from the sales constituted business income. Under either theory, he argues that lots owned by petitioners in Broadwater and Lennox were held primarily for sale to customers in the ordinary course of business. Section 1221(1), Internal Revenue Code of 1954, provides as follows: SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; In Malat v. Riddell, 383 U.S. 569 (1966), the Supreme Court held that the word "primarily," as used in section 1221(1), means "of first importance" or "principally." Using this definition, we agree with respondent that petitioners held the disputed lots "primarily" for sale to customers in the ordinary course of business and not for investment. It is well established that *254 the issue is factual. Many factors have been used by the courts as guides in ascertaining the "primary" purpose of the sale of real estate. See those listed in Pool v. Commissioner, 251 F. 2d 233 (C.A. 9, 1957). While helpful, no single factor is decisive since the relative weight to be accorded each of them varies with the particular situation facing the court. Los Angeles Extension Co. v. United States, 315 F. 2d 1 (C.A. 9, 1963). In our opinion the petitioners, independent of the construction company, were in the business of selling lots in Broadwater and Lennox. They purchased 78 lots in Broadwater in 1951 and more than three entire blocks in Lennox during 1961 and 1962. It is true that petitioners held the lots in Broadwater for 10 years prior to the increased sales in the years now before us, and that the Lennox acquisitions were made only after other parties had contacted petitioners, factors which tend to indicate an intent to invest. However, the more critical factor is the purpose for which the property was held up to and at the times of the sales. Friend v. Commissioner, 198 F.2d 285 (C.A. 10, 1952); Rollingwood Corp. v. Commissioner, 190 F. 2d 263 *255 (C.A. 9, 1951). There are several facts which demonstrate to our satisfaction that during the years in question the petitioners were in the real estate business and were not merely passive investors. They owned many lots, most having been acquired in the years before us. They acquired part of a block in Lennox in 1961 and three entire blocks there in 1962, plus 28 lots in the Cannon Addition in 1963. More important, the listing of the lots with the construction company reflects a purpose of regular selling activity. Even though the lots were not advertised in newspapers and no "for sale" signs were displayed, this does not obscure the fact that petitioners, either knowingly or unknowingly, effectively utilized the construction company as their selling agent. The construction company was the largest builder in Helena, and L. P.'s reputation as a good builder was established throughout the community. Moreover, it was well known that the construction company would provide a design for a home, arrange the financing, and assist the customer in finding a suitable lot. It had built several homes in Broadwater and Lennox and these homes were the company's best advertising. When a customer *256 wanted to build in those areas because of friends, zoning, schools or price, he often depended upon the construction company to help him find a lot; and, since petitioners owned and listed a substantial portion of the lots in that area, many of the customers bought petitioners' lots when they contracted for a L. P. Barney home. Thus, we view the construction company as an agent used by petitioners to sell their lots. Cf. William A. Scheuber, T.C. Memo. 1966-107. Petitioners had no need to advertise their lots in newspapers because the close connections with the construction company generated sufficient sales activity. These facts, as well as the number of lots sold during the years in issue (9 in 1961, 12 in 1962, and 15 in 1963) convince us that petitioners were primarily in the real estate business. See E. Aldine Lakin, 28 T.C. 462 (1957), affd. 249 F. 2d 781 (C.A. 4, 1957); Mathews v. Commissioner, 315 F. 2d 101 (C.A. 6, 1963); and Joseph M. Philbin, 26 T.C. 1158 (1956). Petitioners argue that the sales of lots in Broadwater must be viewed as passive and gradual liquidations of their holdings there. They claim *257 that because of the eightfold increase in taxes levied upon Broadwater property owners to pay for the S.I.D., and because their lots were non-income-producing property, they were forced to liquidate a part of their holding to pay such increased costs. Since increasing property taxes are a common occurrence in our society today, we think that reason, standing alone, is insufficient to justify our characterizing what otherwise is "primarily" a real estate business as a long-term liquidation of an investment. As an alternative basis for our decision, we also believe that the real estate activities of petitioners were a part of the construction company's business. L. P. prided himself on the ability of his construction company to supply plans for building the homes, arranging the financing, and helping a customer find an available lot. While this may not be "package building" in the technical sense that the builder actively undertakes other facets of the building project, such as acquiring real estate, in order to obtain a contract, see Heebner v. Commissioner, 280 F. 2d 228 (C.A. 3, 1960), affirming 32 T.C. 1162 (1959), the fact remains that the petitioners' *258 ownership of a substantial number of lots in the areas where the construction company built many homes was certainly beneficial to the company and in turn to the petitioners. It was convenient for potential customers to deal with only one party in the acquisition of a lot and the construction of a home upon it. The construction company always knew that lots were readily available in those areas and could contact the owners (petitioners) with a minimum of effort. Although a customer of the construction company was not given a lower price if he purchased a lot from petitioners, the office staff of the Barney company knew the price which petitioners were asking for each lot. Surely this simplified the showing of available lots to prospective customers and made it easier to give an estimate for the entire package. And real estate commissions were probably avoided since the construction company was really acting as the broker in such instances. The construction company built two model homes on lots owned by petitioners in Lennox during the years before us. There was extensive promotion and advertising of these homes built by L. P. Barney and they were visited by hundreds of people. The *259 gains attributed to the lots on which the model homes were built were reported by petitioners as ordinary income. However, the purpose of showing the model homes was to sell the construction company homes, primarily in Lennox. Since petitioners owned more than three blocks in that area, it is logical to conclude that sales of the construction company homes led to sales of petitioners' building lots. That appears to have happened, judging by the number of sales of lots owned by petitioners in Lennox during 1961 and 1962. This indicates to us that the purpose of holding those lots was as an extension of the construction company's business, designed to encourage its building activities. Consequently, it can be said that the sales were made to customers in the ordinary course of the company's business, which of course was the sole proprietorship of L. P. Barney. Another factor we find significant is that the gains realized from the sales of lots were substantial, especially when the operating profits from construction are compared with the profits from the sales of lots. This is illustrated by the following figures: Taxable
Operating profits
Profits from
year
from construction
sales of lots
1961
$22,786.61
$7,604.11
1962
22,811.30
6,581.35
1963
34,024.66
6,807.72
*260 Despite the points advanced so skillfully by petitioners' counsel, we are not persuaded by this record that the activities of petitioners were minimal, passive and in the nature of holding the building lots in Broadwater and Lennox for appreciation in value so as to take petitioners out of the real estate business. Since each case involving this issue necessarily depends in the final analysis on the totality of its own facts, it would serve no useful purpose to review in detail the various factual patterns which existed in the many cases cited by counsel for both parties. Suffice it to say that we have considered all of them. The decisions relied upon by petitioners are all distinguishable. See e.g., Ben L. Carroll, 21 B.T.A. 724 (1930); Walter R. Crabtree, 20 T.C. 841 (1953); W. T. Thrift, Sr., 15 T.C. 366 (1950); James G. Hoover, 32 T.C. 618 (1959); and Lloyd E. Mitchell, Inc. v. United States, 259 F. Supp. 345 (D.C. Md. 1966). Nor can we accept petitioners' alternative position that Dora's one-half interest in the lots should be treated as capital, notwithstanding the provision of Montana law making her an equal *261 owner with her husband. Here the petitioners acquired the lots as joint tenants. They filed joint income tax returns. And, as we see it, Dora was inextricably involved with L. P. in sales of the lots in connection with his construction business, a sole proprietorship. Cf William A. Scheuber, supra; and William S. Grimaldi, T.C. Memo. 1963-156. Accordingly, we hold that the lots in question were held by petitioners primarily for sale to customers in the ordinary course of business and the sales thereof resulted in ordinary income to them. Petitioners also contest respondent's adjustment limiting the allowable capital loss in 1963 to $1,000 instead of $1,250 as claimed in their income tax return. In view of our holding with respect to the primary issue, we agree with respondent that the lots sold in 1963 do not qualify as capital assets under section 1221, thus eliminating all reported capital gains for that year. Therefore, it follows that, pursuant to section 1211, the capital loss for that year should be limited to $1,000. Decision will be entered for the respondent.