Ralph W. Simmers and Son, Inc. v. Commissioner.
Ralph W. Simmers & Son, Inc. v. Commissioner
Docket No. 7115-65.
United States Tax Court
T.C. Memo 1968-150; 1968 Tax Ct. Memo LEXIS 150; 27 T.C.M. (CCH) 739; T.C.M. (RIA) 68150; July 16, 1968. Filed Stanley Worth and Jules G. Korner, III, Suite 700, Brawner Bldg., 888 Seventeenth St. N. W., Washington, D.C., for the petitioner. Hobart Richey, for the respondent. KERN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the income tax of the petitioner for the calendar years 1963 and 1964 in the respective amounts of $57,985.15 and $7,032.52. At the hearing of this case the petitioner conceded the correctness of the respondent's determination of deficiency for 1964. The only issue remaining for our decision relates to the determination by the respondent that real estate sold by the petitioner in *151 1963 was property held for sale in the ordinary course of its business and that, therefore, the gain on the sale is reportable as ordinary income rather than long term capital gain. Findings of Fact The petitioner is a Maryland Corporation having its principal office in Baltimore, Maryland at the time of the filing of the petition herein. It filed its federal tax returns for 1963 and 1964 with the district director of internal revenue at Baltimore. The petitioner was incorporated in 1948 as Plymouth Building Co., Inc. By 740 amendment to the corporate charter in 1950 its name was changed to Ralph W. Simmers and Son, Inc. The pertinent powers granted to it by its Certificate of Incorporation are as follows: (a) To carry on and to conduct a general building, construction and contracting business for the building, construction or erection of buildings, properties and projects of any and all types and kinds, and of any and all types and kinds of construction; to enter into contracts and agreements therefor and to fully and completely carry out the same. (b) To deal in, own, hold, transfer, mortgage, assign and convey real estate, ground rents and leasehold interests in land *152 and in all manner generally to conduct the business of building, operating and maintaining real estate and real estate developments. Petitioner was organized to take over and continue the building, construction and contracting business operated as a sole proprietorship by Ralph W. Simmers, Sr. (hereinafter sometimes referred to as Ralph, Sr.), who died on May 23, 1951, after having suffered several heart attacks in 1949 and 1950. The typical pattern of the operation of the building, construction and contracting business was to acquire an undeveloped tract of land, subdivide it into lots, build houses thereon, and sell such houses and lots to the public. The outstanding capital stock of petitioner, consisting of 65 shares, was held from 1950 until the date of death of Ralph, Sr., on May 23, 1951, as follows: Ralph W. Simmers, Sr
26 shares
Mary E. Simmers (wife of R. W. S., Sr.)
26 shares
Ralph W. Simmers, Jr.
7 shares
Jean H. Simmers (wife of R.W.S., Jr.)
6 shares
Total
65 shares
The estate of Ralph, Sr., held his 26 shares until November 2, 1956, at which time 4 1/2 shares were distributed to Ralph W. Simmers, Jr. (hereinafter sometimes referred to as *153 Ralph, Jr.) and 21 1/2 shares were distributed to the Union Trust Company, Testamentary Trustee, as authorized by the Probate Court. Mary E. Simmers (hereinafter sometimes referred to as Mary) purchased the 6 shares owned by Jean H. Simmers on September 25, 1961 and the 21 1/2 shares held by the trustee sometime in 1962. Since December 31, 1962, the stock of petitioner has been held as follows: Mary E. Simmers
53 1/2 shares
Ralph W. Simmers, Jr.
11 1/2 shares
Total
65 shares
The three-man board of directors of petitioner included Ralph, Jr., and Mary from 1948 through 1963. The third director was Ralph, Sr., until his death in 1951, Jean H. Simmers from 1951 until 1961, and Samuel Harbeck from 1961 through 1963. Ralph, Sr., served as president of petitioner until his death. The following served as officers of petitioner between May 28, 1951, and December 12, 1958: Ralph W. Simmers. Jr.
President
Mary E. Simmers
Vice President and Treasurer
Robert Conway
Secretary
Ralph, Jr., continued to serve as president of petitionerve as president and treasurer and Ralph, Jr., as Secretary. Petitioner paid the following salaries between the years *154 of 1950 and 1963: 1950
Ralph, Sr.
$13,500.00
Ralph, Jr.
5,925.00
Robert Conway
3,735.00
$23,160.00
1951
Ralph, Sr
$ 7,125.00
Ralph, Jr.
14,405.50
Mary
4,540.30
Robert Conway
4,168.00
$30,238.80
1952
Ralph, Jr.
$ 6,084.65
Mary
1,430.70
Robert Conway
1,122.00
$ 8,637.35
1953-55
Ralph, Jr.
$ 2,400.00
1956
Ralph, Jr.
$ 5,200.00
1957-62
Ralph, Jr.
$ 2,400.00
1963
Ralph, Jr.
$ 2,400.00
Mary
3,000.00
$ 5,400.00
Petitioner was inactive with regard to the acquisition and development of unimproved real estate from its incorporation in 1948 until January 9, 1950. At that time Ralph, Sr., and Mary transferred to petitioner in exchange for stock a parcel of land of some 40 acres located a few miles north of the city of Baltimore. The petitioner proceeded to subdivide this parcel, known as and herein referred to as the Knettishall development, and to construct and sell approximately 300 row houses thereon between 1950 and 1952. 741 The corporate minutes of petitioner covering an annual meeting held April 16, 1951, reflect that on October 23, 1950, petitioner entered into negotiations with James and *155 Marguerite Dorment for the purchase of approximately 18 acres of land located south of the Knettishall project, that a check in the amount of $18,300 had been drawn for the down payment thereon (of a total consideration of $90,000), and that up to the time of the meeting the check had not been accepted by the Dorments and no formal contract had been entered into. This proposed purchase was never consummated. Pursuant to a contract of sale executed on March 9, 1950, the petitioner acquired by a deed dated September 8, 1950, from the Hillendale Realty Co. a parcel of land of about 165 acres located just north of the Baltimore city limits, hereinafter sometimes referred to as Hillendale. The cost of the property to the petitioner was $300,000, consisting of a cash payment of $50,000 and a mortgage given by petitioner for the balance. Prior to the time of the transfer, this parcel, known at that time as the Hillendale Golf Course, was under lease to the Hillendale Country Club, hereinafter sometimes referred to as the Club, and it was agreed that the Club would continue to lease Hillendale from the petitioner. Petitioner renewed the lease with the Club for a term ending December 31, 1952. In *156 October of 1951 this lease was terminated by the parties and a new lease of all of Hillendale was executed for a term ending March 1, 1954, subject to the right of either party to terminate at certain specified dates on 90 days' notice. In 1953 petitioner exercised its right to terminate its lease with the Club and later in that year sold 71.85 acres of Hillendale to the East Gate Co. (hereinafter sometimes referred to as East Gate), an unrelated corporation. As part of the sale agreement petitioner agreed that it would (1) refrain from making application for a zoning change of the remaining part of the Hillendale property owned by it, which was then zoned " a' Residential," (2) join with East Gate at any time within two years upon its request in an application to the proper authorities for approval of development or subdivision plans relating to the land conveyed and the remaining portion of Hillendale as one development (which agreement contemplated the conveyed land being rezoned to "'D' Residential," allowing group houses, and the remainder of Hillendale to continue as "'A' Residential," which allowed only detached houses) and (3) share with East Gate the expense of construction *157 of a common road between the property transferred and a portion of the remainder of Hillendale. The agreed upon consideration for this transfer was $2,000 per acre to be paid at the settlement and an additional $2,362.50 per acre if and when within the following eighteen months the land transferred was rezoned from an "A Residence" zone to a "D Residence" zone. The total proceeds received by petitioner in 1953 on account of the transaction with East Gate as reflected on its 1953 income tax return was $143,900. Subsequent to 1953 a part of the land involved in the 1953 sale was rezoned to "Residence D" and petitioner received from East Gate pursuant to their agreement of 1953 an additional payment of $105,249.38 as reflected by petitioner on its 1955 income tax return. The portion of Hillendale remaining after the sale of the 71.85 acre plot to East Gate included a clubhouse, swimming pool and locker room facilities. Upon the sale to East Gate petitioner leased the swimming pool and locker room facilities to the Kiwanis Club of Loch Raven, Maryland, and the clubhouse to an organization known as the Gridiron Club. These leases, which also included surrounding grounds and parking *158 facilities, remained in effect up through the time of the hearing of this case. On September 28, 1951, 4 months after the death of Ralph, Sr., petitioner entered into an agreement with Louise C. Buehler and Alexander Baliko, Jr., under which it agreed to purchase a parcel of land of 41 acres in Baltimore County for a total consideration of $73,800, consisting of a cash payment of $7,380, a payment of $16,420 to be paid at the time of settlement, and the assumption of a mortgage of $50,000. The minutes of petitioner for a special meeting held September 28, 1951, contain the following reference to this agreement: The chairman [Ralph, Jr.] stated that although this contract was in the name of the corporation and would obligate the corporation to purchase the land, it was his hope and belief that prior to the date of final settlement [on or before January 1, 1952] he would be able to sell all of the corporation's right, title and interest under the contract, without any financial loss to the corporation. On November 1, 1951, petitioner assigned all its rights under the Buehler-Baliko contract to Ralph, Jr., in consideration of a 742 payment by him of $7,380 cash and the *159 assumption by him of the obligation of petitioner thereunder. On or about November 1, 1951, the Ralph W. Simmers Building Co., hereinafter referred to as the Building Co., was formed, with Ralph, Jr., as the sole shareholder from its inception until its liquidation in 1963. He alone controlled its operations. The officers of the Building Co. during the period of its existence were as follows: Ralph W. Simmers, Jr.
President
Mary Simmers
Vice President
(until October 27, 1961)
Treasurer
(from Oct. 21, 1961 until April 11, 1963)
Secretary-Treasurer
(from April 11,1964 for balance of year)
Secretary
(from Sept. 12, 1958 through 1963)
Robert Conway
Secretary
(until Sept. 12, 1958)
Jean H. Simmers
Treasurer
(until Sept. 27, 1961)
On November 1, 1951, Ralph, Jr., transferred his rights under the Buehler-Baliko contract to the Building Co. in exchange for the following consideration, as recited in a resolution adopted by the Building Co.: 262 Shares of the Capital Stock of The Ralph W. Simmers Bldg.
$ 26,200
Co., Par $100, valued at
Note of the corporation, bearing interest at the rate of 3% per
7,380
annum, due November 1st, 1953
Assumption of the obligation of Ralph W. Simmers, Jr., to pay
16,420
Louise C. Buehler and Alexander Baliko, Jr., on or before Janu-
ary 1st, 1952
Execution of a mortgage to Louise C. Buehler and Alexander
50,000
Baliko, Jr., which mortgage will be due three years after date,
with in- terest at 4 1/2% per annum, pay- ablr semi-annually
Total
$100,000
*160 The Knettishall project was completed by petitioner early in 1952. The property covered by the so-called Buehler-Baliko contract was developed by the Building Co. as a development known as Kenwood. Around April 1, 1952, the Building Co. leased from petitioner the following equipment at an annual rental of $12,000: 1
- 6 X 6 GMC Truck
1
- 4 X 4 Chev. Truck
1
- Loader
1
- Bulldozer
1
- Shovel
2
- Tractors
1
- Water Wagon
1
- Quonset Hut & Equip. installed
1
- Office & Equip. installed
1
- Pontiac Station Wagon
1
- Ford Jeep In addition to renting all of petitioner's construction equipment, the Building Co. also took over its construction work force. On or about July 1, 1955, all of the equipment which had been leased to the Building Co. from petitioner was purchased by the Building Co. In the years 1955, 1957 and 1958 petitioner sold to the Building Co. parcels in the Hillendale tract of approximately 17 1/2 acres (referred to herein as parcel B), 4 1/2 acres (referred to herein as parcel C), and 1 1/2 acres (referred to herein as parcel D) respectively. The consideration for the sale of parcels B and D was $2,500 per acre. The record does not *161 disclose the price paid by the Building Co. for parcel C. The Building Co. subdivided each of these parcels and built and sold houses thereon. The Building Co. also obtained from the petitioner in 1955 an option to purchase within 18 months approximately 23 acres within the Hillendale tract some undisclosed part of which lay within the parcel referred to herein as parcel F, the sale of which is in question herein. This option was extended from time to time until December 14, 1958. The Building Co. did not exercise its right under this option agreement. In 1960 a parcel of approximately 3 acres in the tract referred to herein as parcel E, was taken under threat of condemnation by the authorities of Baltimore County for the purpose of providing a site for a new school building. During the period from 1953 through 1963 petitioner was approached on numerous occasions by parties interested in purchasing part or all of Hillendale although petitioner did not list any part of Hillendale for sale with a realtor at any time. No sales were made except as detailed in these findings. In 1963 a realtor again contacted Ralph, Jr., regarding the possibility of purchasing parcel F, the sale *162 of which forms the basis of the issue herein. After talking with his mother Ralph indicated that the petitioner might be interested in selling "if the price 743 is right." Subsequently the Mark-Hall Co., through its president, Nathan Posner, made an offer to petitioner to buy parcel F of about 52 acres at $7,700 an acre conditioned upon the obtaining of a change in zoning. This offer was rejected by petitioner. Mark-Hall then offered $5,500 per acre for parcel F taken on an "as is" basis. This offer was accepted by petitioner and a contract of sale was entered into on or about June 28, 1963. The sale was consummated at a settlement on or about October 1, 1963. Parcel F contained approximately 16 acres of "flood plain area," with an erratic topography, which could not be developed without a large expenditure of money to prepare the terrain for development. On the date of sale parcel F was zoned "R-6," which permitted only single unit residences on a minimum of 6,000 square feet per unit. Subsequent to the purchase Mark-Hall obtained a zoning change in order to provide for the construction of multi-family dwellings as well as single family units. At the time of the sale there existed *163 one sewer line constructed by the East Gate Co. on the line common to the portion of Hillendale it had purchased and parcel F, and a partially paved road on this same line, the cost of which had been shared by East Gate and petitioner pursuant to their contract of sale referred to above. After the sale of parcel F, petitioner retained approximately 7 acres of the original Hillendale tract. This retained parcel included the original Hillendale Country Club buildings, parts of which were continuously leased to two organizations, previously indicated, and parts of which served as offices for petitioner and the Building Co. from about 1955 up until the time of the trial of this case. Beginning in 1950 the firm of George William Stephens, Jr., and Associates, Inc., hereinafter referred to as Stephens and Associates, did surveying, engineering and drafting work for petitioner. During the period 1953-1964 Stephens and Associates drew up numerous plans or drawings with respect to parcels within the Hillendale tract owned by petitioner or the Building Co. Among these drawings were "outline plats" whose purpose was to delineate boundaries and set out proposed street and sewer locations. *164 Many of the plans or plats carried the name of the Building Co. or that of Ralph, Jr., including some which related to parts of Hillendale owned by petitioner at the time they were drawn up. All of the invoices for the engineering work done by the Stephens firm except one [1] were addressed to either the Building Co. or Ralph, Jr. On one invoice addressed to the Building Co. there was a notation by a secretary employed by the Stephens firm to the effect that it had been paid "by Ralph W. Simmers & Son, Inc., Ralph W. Simmers." Stephens and Associates prepared a number of plans or plats which included part or all of parcel F. The first was a "preliminary plan" drawn and dated July 29, 1954, including all of Hillendale with the exception of parcel A, which had been sold to East Gate. This plan carried the name of "Ralph W. Simmers Building Co.," as the developer. The "preliminary plan" reflected proposed street and sewer locations as well as the numbering and location of proposed lot sits within the tract. It was submitted to the Office of Planning and Zoning of *165 Baltimore County in order that it could be distributed to various county departments for their comments, which comments were submitted to the Building Co. in writing on or after October 11, 1954. The "preliminary plan" as revised was resubmitted for "tentative approval" which was granted on March 31, 1955. "Final approval" could be obtained by submitting "record plats" to the Director of Planning, the Health Department, and the Director of Public Works of Baltimore County and then recording these plats with the clerk of the county. Ordinarily "tinal approval" would be made after "tentative approval" had been granted, if the overall plan of the developer remained unchanged and the requisite plats were submitted for recording. The plan referred to, i.e., the one dated July 29, 1954, revised as of January, 1955, and tentatively approved on March 31, 1955, was never submitted for "final approval" in its entirety. "Record plats" for the parcels B, C and D later purchased by the Building Co. were recorded as submitted by it for record. In addition to the "preliminary plan" and its revision another plan prepared by Stephens and Associates carrying the name of petitioner as developer showed *166 the layout of lots on the eastern edge of parcel F, 744 bordering parcel A, which was the parcel sold by petitioner to East Gate. A later plan prepared by Stephens and Associates dated May 3, 1961, showed this same area and reflected a proposed rezoning to allow for group houses. The record does not disclose the person who was designated as developer on the face of the plan itself. Another plan dated July 6, 1961 was a "preliminary plan" for parcel F and designated the Building Co. as developer. In addition to these plans the following plans were prepared by Stephens and Associates relating to parcels owned by petitioner and showing the Building Co. as the developer: 1. Outline plat of parcel C, prepared June 10, 1955, revised June 23, 1955. Parcel C was sold to the Building Co. in 1957. 2. Outline plat of parcel B, prepared June 10, 1955, revised June 23, 1955. Parcel B was sold to the Building Co. on June 14, 1955. 3. Outline plat of parcel D prepared July 24, 1958, revised September 11, 1958. Parcel D was sold to the Building Co. on September 18, 1958. 4. Copy of a record plat showing part of parcel B, dated May, 1955. This plat showed the "Ralph W. Simmers Building *167 Company," as developer. Stephens and Associates also prepared an outline plat of the clubhouse and parking area in 1956, a plat showing the common line between parcel F and other parcels including a proposed storm drainage area and park area in 1955, a plat showing parts of parcels B and G in 1954 and a plat to accompany a description of the Gridiron Club on parcel G in 1963. The record does not disclose the person or the purpose for which these plats were prepared. The following schedule represents loans made in 1952 and 1953 to the Building Co. by petitioner and the repayments thereof made by the Building Co. during the years 1955 through February 2, 1963: Interest
Repayment
Issued
Due Date
Rate
Amount
Amount
Date
7/ 3/52
7/ 3/54
3%
$125,000
$ 90,000
1956-63
7/29/52
7/29/54
3%
12,000
12,000
1959
9/22/52
9/22/54
3%
30,000
30,000
1958
1/ 2/53
Demand
3%
9,000
9,000
1955
2/ 9/53
2/ 9/55
3%
65,000
None
6/ 5/53
6/ 5/55
3%
5,000
5,000
1955
8/ 3/53
8/ 3/55
3%
8,000
None
TOTAL
$254,000
$146,000 On December 16, 1963 the petitioner agreed to purchase from the Building Co. the following assets *168 for a total price, to be paid in cash, of $52,328.13: Value
Duly recorded Mortgage
$11,334.13
Life Insurance Policy #1,584,670 issued by
$13,788.00
The Con- necticut Mutual Life Insurance
Company on the life of Ralph W. Simmers, Jr.,
owned by the Corporation - Value as of
11/25/63
Premium paid on said policy from 11/25/63 to
706.00
14,494.00
2/25/64
Fee simple property known as 6818 Collinsdale
Road, Baltimore County, Maryland -
Improvements
$17,500.00
Land
2,500.00
20,000.00
Parcel of land located on Hazelwood Avenue,
5,000.00
Baltimore County Maryland
One (1) Allis Chalmers Model HD-SG Diesel
1,500.00
Tractor, Serial ##5G7852 and back tire
including one (1) 080752 lift fork, Serial
##59
TOTAL
$52,328.13
On or before December 31, 1963, the Building Co. made a final repayment to petitioner of $67,643.36 to apply against the balance of principal and interest due on the $125,000 note of July 3, 1952, the $65,000 note of February 9, 1953 and the $8,000 745 note of August 3, 1953. The Building Co. was liquidated on December 31, 1963, at which time the petitioner charged off the balance of the unpaid indebtedness of the Building *169 Co. of $40,256.64. A balance sheet of an unaudited financial statement of petitioner for the year ended December 31, 1961, prepared by H. L. Langrall & Co., certified public accountants, reflected as one of the corporate assets "Land for Development" in the amount of $70,515.38. The financial statement contained the following "comment" related to this item: This value has been assigned to the approximately 62 acres of land owned by the corporation in Baltimore County, Maryland, which land was formerly a part of The Hillendale Golf Course. On petitioner's books this item was carried as "Land, Hillendale." On petitioner's income tax returns for 1950 through 1964 prepared by H. L. Langrall & Co., petitioner's principal business activity was represented as "builder" or "builders." The balance sheet required by the corporate income tax return in the returns for 1950 through 1963 included the Hillendale property as "Land for Development." In a schedule of assets on the return for 1963, the year of the transaction in issue, the Hillendale property was shown in an asset category "Land for Development" in the amount of $70,515.38 as of January 1, 1962. This account was shown as reduced *170 to zero by December 31, 1963. The descriptive terminology used in the financial report and the income tax returns was that of the certified public accountants who prepared those documents. Petitioner's income tax returns for the years 1952 through 1962 show total gross income and capital gain from the sale of land as follows: Year
Gross Income
Gain from Sale
of Land
1952
$164,921.41
$ none
1953
85,915.08
* 37,727.95
1954
39,047.73
none
1955
144,140.56
** 102,785.56
1956
55,680.87
none
1957
41,736.17
3,230.52
1958
35,137.21
1,229.87
1959
38,033.09
none
1960
42,293.02
11,794.54
1961
25,817.16
none
1962
25,869.47
none
*171 In its income tax return for 1963 petitioner reported a net profit of $196,391.91 on the sale of parcel F to the Mark-Hall Co. as long term capital gain. The primary purpose for the acquisition by petitioner of the Hillendale tract and for holding it until not later than July 1, 1955, was to use it in the regular course of its building, construction and contracting business by developing and subdividing it, building houses on the lots of the subdivisions and selling the improved lots to customers. A secondary purpose, contingent upon the primary purpose becoming unfeasible, was to hold the tract with the hope and belief that it would appreciate in value and with the intent of realizing such appreciation by its ultimate sale. After a time not later than July 1, 1955, when it abandoned its purpose of holding it for sale in the regular course of its building, construction and contracting business, and until the sale of the tract in 1963, the primary purpose of petitioner in holding this tract was to realize a hoped-for appreciation in its value by its sale or sales at an appropriate time and price or appropriate times and prices without development or sales activity on its part. *172 A secondary purpose was to make sales therefrom of small parcels to the Building Co. as needed by the latter in its business pending the ultimate sale of the tract at an appropriate time and price. At the time of its sale in 1963 parcel F of the Hillendale tract was not held by petitioner for sale to customers in the regular course of its business. Opinion KERN, Judge: In 1963 petitioner realized a gain of $197,391.91 on the sale of parcel F of the Hillendale tract. The question pretented herein is whether this gain is to be taxed as ordinary income, as determined by the respondent, or as long term capital gain, as contended by the petitioner. The correctness of the determination of the respondent turns on whether petitioner was holding parcel F "primarily for sale to customers in the ordinary course of [its] trade or 746 business" within the meaning of section 1221, I.R.C. 1954. [1]
*173 The underlying purpose of section 1221 is stated by the Supreme Court in Malat v. Riddell, 383 U.S. 569 at 572, as follows: The purpose of the statutory provision * * * is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * and "the realization of appreciation in value accrued over a substantial period of time" on the other. Among the pertinent factors to be considered in resolving the question of whether the profits involved in this case arose from the everyday operation of a business or constituted the realization of appreciation in value accrued over a substantial period of time are the following: the purpose of the taxpayer in acquiring the property; the purpose for which it was held at the time of sale; the number and frequency of sales, and the continuity of sales related activity over a period of time; the acquisition of adjacent land; the extent of taxpayer's activity in developing or improving the property, soliciting customers and advertising; and the substantiality of the sales when compared to other sources of taxpayer's income. The question must be resolved in the light of all of the *174 pertinent factor; no one of them is determinative. With regard to the factor of petitioner's purpose in acquiring the Hillendale tract we have concluded, as indicated in our findings, that its primary purpose, see Malat v. Riddell, supra, was to use the property in the regular course of its building, construction and contracting business by developing it, subdividing it, building houses on the lots of the subdivisions and selling the improved lots to customers. In reaching this conclusion we have not overlooked the testimony of the widow and the surviving son of Ralph, Sr. to the effect that Ralph, Sr. explained his purchase of the Hillendale tract at a time when he was in poor health and was contemplating the possibility of forced retirement by stating that in his opinion it would prove to be a good investment. We have considered this testimony given in 1967, which was based on the memory of conversations taking place in 1950, in the light of the following undisputed background facts: Petitioner acquired land used by it in the development known as Knettishall just 3 months prior to its acquisition of Hillendale and shortly after the acquisition of Hillendale petitioner *175 negotiated for the purchase of additional property from persons named Dorment; there is nothing to indicate that the health of Ralph, Sr., admittedly bad, was any worse in March, 1950 (when Hillendale was acquired), than in January, 1950 (when the Knettishall property was acquired) or in October, 1950 (when the negotiations with the Dorments started); and even though Ralph, Sr. contemplated the possibility of being less active, personally, in the business, the formation of petitioner corporation, the participation of Ralph, Jr., in the business, the availability to petitioner of an adequate labor force under competent supervisory personnel and the ownership of the necessary equipment give no indication that the business which he had carried on so long was being abandoned on account of his poor health. These facts coupled with the absence of any showing that petitioner or Ralph, Sr. had ever purchased or held real estate as an investment persuade us that the primary purpose for the acquisition of the Hillendale tract by petitioner was its 747 use in the regular course of its business and that any consideration given to holding it as an investment was secondary and contingent. *176 However, there were drastic changes which took place with regard to petitioner's intended use of the Hillendale tract and its purpose in holding this property after the death of Ralph, Sr., in 1951. After the Knettishall development was completed in 1952, petitioner engaged in no other construction project. Late in 1951 Ralph, Jr. organized Building Co., which can in no way be considered an alter ego, agent or subsidiary of petitioner, and which was intended to and did engage in the development and construction business. In 1952 petitioner leased all of its construction equipment to Building Co. About the same time Building Co. took over all of petitioner's work force and supervisory personnel. In 1955 petitioner sold all of its equipment to Building Co. These facts substantiate the testimony of Ralph, Jr. and his mother to the effect that petitioner abandoned its building, construction and contracting business after the death of Ralph, Sr., and no longer had the purpose of holding the real estate here involved for ultimate subdivision, improvement and sale by it to customers in the regular course of its business. We have concluded that the intention to abandon the building, construction *177 and contracting business was fully implemented and accomplished not later than July 1, 1955, when all of its construction equipment was finally sold, and that thereafter the primary purpose of petitioner in holding the Hillendale tract was to realize a hoped for appreciation in its value without development or sales activity on its part, or, in other words, to hold it as an investment. As we said in Joseph A. Harrah, 30 T.C. 1236 at 1241: While the underlying purpose of the original acquisition of property is to be given consideration, it is clear that such purpose may change over a given period of time. When this has been the case, the original purpose necessarily must give way to the purpose for which the property is held at the time of sale. And "* * * the purpose for which the property was held when sold is entitled to considerable weight." See Alice E. Cohn, 21 T.C. 90, 100, aff'd 226 F. 2d 22 (C.A. 9, 1955). See also Estate of Peter Finder, 37 T.C. 411, 418; S. O. Bynum, 46 T.C. 295, 299; Lloyd E. Mitchell, Incorporated v. United States, 259 F. Supp. 345, 349-350. Respondent points to several *178 sales of small acreage from parcel F made by petitioner to the Building Co. as indicating that petitioner in 1963 was in the business of selling the property to the Building Co. and thus was holding it for sale to customers in the regular course of its business. He also points to certain plats and surveys which were made as indicating a purpose on the part of petitioner to hold parcel F for sale to customers in the regular course of its business. We have considered these matters, together with other minor matters referred to by respondent on brief, but have concluded that while a secondary or subordinate purpose of petitioner may have been to sell small parcels of the property to the Building Co. as needed by the latter in its business pending the ultimate sale of parcel F at an appropriate time and price, the primary purpose of petitioner in holding this property from 1955 to the time of its sale in 1963 was to realize gain on an investment. See Lloyd E. Mitchell Incorporated v. United States, supra. The other factors which are pertinent to the question before us and which we have set out in the third paragraph of this opinion are either of neutral effect in the context *179 of the facts of this case or substantiate petitioner's position herein. The issue before us must be decided for petitioner. Decision will be entered under Rule 50. Footnotes
1. One invoice dated May 7, 1963, was addressed to Ralph W. Simmers Co. It bore a red notation "Ralph W. Simmers."↩
*. Including $25,526.95 gain on the sale of 71 plus acres of the Hillendale tract to East Gate Co. in 1953. ↩
**. Including item of $90,249.38 reported as gain on sale of land made in 1953 with "final settlement received in 1955." This item represents the upward adjustment of the purchase price to be paid by East Gate for 47.55 acres of the 71 plus acres sold to it in 1953 from $2,000 an acre to $4,362.50 an acre upon the rezoning of this property to a "D" Residence Zone ($105,249.38) less $15,000 additional commissions.↩
1. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, or similar property, held by - (A) a taxpayer whose personal efforts created such property, or (B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property; (4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or (5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.↩